**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marvin BERKOWITZ,
Defendant–Appellant.**

No. 89–2125.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1990.

Decided March 15, 1991.

Thomas M. Durkin, William V. Gallo, Asst. U.S. Attys., Office of the U.S. Atty., Chicago, Ill., for plaintiff-appellee.

William J. Stevens, Chicago, Ill., for defendant-appellant.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

A jury convicted Marvin Berkowitz of two counts of obstruction of justice, 18 U.S.C. § 1503, and one count of stealing government property, 18 U.S.C. § 641. Berkowitz appeals, contending that the district court erred by denying his motion to suppress evidence, that certain actions by the district court deprived him of the assistance of counsel, that when he did have counsel he provided ineffective assistance, and that the district court improperly sentenced him. 712 F.Supp. 707. We reject Berkowitz's assistance of counsel and sentencing claims, but remand for an evidentiary hearing on his motion to suppress.

I.

A grand jury indicted Berkowitz (along with others) in April 1988, alleging numerous counts of tax fraud, mail fraud, and obstruction of justice centering around the sales of allegedly fraudulent tax shelters (the "tax fraud case"). During its investigation of Berkowitz's activities, an investigation that began in 1983, the government accumulated almost 18,000 documents, plus other exhibits, all of which filled more than 50 boxes.

The government stored this evidence in a file room in a secured area of the United States Attorney's (USA) office in Chicago, and in June 1988 established a procedure to allow the defendants in the tax fraud case to inspect, examine, and photocopy those

documents that were discoverable to prepare for trial. Boxes that were available for immediate inspection were marked with a "Y" or the word "Yes." However, some documents such as witness statements, internal memoranda, and work product were either not discoverable or, under Fed.R. Crim.P. 16, Northern District of Illinois Local Rule 2.04, or the Jencks Act, 18 U.S.C. § 3500, were not discoverable until a later date. The government kept these documents in boxes marked with an "N" or the word "No." To gain access to the documents, a defendant or his attorney had to make an appointment with IRS Special Agent Merle Shearer. On the appointed date, either Shearer or IRS Special Agent Frank Calabrese would escort the defendant or his attorney to the file room containing the documents.

Of the defendants in the tax fraud case, Berkowitz showed the keenest interest in examining the government's documents and exhibits; in fact, he was the only defendant to review documents personally at the USA's office. Between July and October 1988, Berkowitz arranged to examine the documents and exhibits 17 times. According to Shearer, the first time he met with Berkowitz and his attorney he escorted them to the file room, explained the procedures to them, showed them which documents were and were not available to inspect, and showed them a photocopier they could use.

Berkowitz, however, turned out to be not particularly scrupulous about following the procedure established for inspecting the documents. On August 17, Calabrese escorted Berkowitz from the file room to the elevators in the reception area of the USA's office after a reviewing session. Calabrese returned to the file room to retrieve his briefcase, went back to the elevators, and found Berkowitz gone. When Calabrese returned to the secured area of the USA's offices (the elevators being in an unsecured area) he found Berkowitz standing in a stall in the men's washroom, apparently hiding. Berkowitz had no permission to return to the secured area.

On October 5, after a reviewing session, Calabrese escorted Berkowitz and his attorney to the first floor of the Dirksen Federal Building, in which the USA's office is located. A little later that day, Assistant United States Attorney William Cook, who was prosecuting the tax fraud case, saw Berkowitz leave the men's bathroom in the secured area of the USA's office and walk to the file room unescorted. After trying to find Calabrese, Cook confronted Berkowitz and asked where Calabrese was. Berkowitz said he was in the men's room; he was not. Cook then went back to the file room, and asked Berkowitz what he was doing. Berkowitz told Cook that he had left something in the file room, and started moving "No" boxes around. Cook told Berkowitz those boxes were off-limits, and Berkowitz left.

Judge Marshall, who was presiding over the tax fraud case, ordered the government to produce by November 15, 1988, a list of the evidence it intended to present at trial and the names of and any background material concerning witnesses it intended to call. To comply with this deadline, Shearer began to review the documents on October 26. At that time, Shearer discovered that about twelve of the fifty boxes of evidence were missing. An investigation revealed that none of the missing documents had been misplaced in the USA's office. One box was found on the Dirksen Building's seventh floor, near a freight elevator accessible both from a public area on the seventh floor and from the secured area of the USA's office.

Cook advised Berkowitz's co-defendants' attorneys that documents were missing, and gave them an inventory of the missing documents. Cook learned on November 4 that documents had been delivered to two attorneys' offices. That same day, receptionists for each of the attorneys identified Berkowitz's picture from a photographic array as the man who had delivered the documents.

The IRS agents and Cook put two and two together and concluded Berkowitz had stolen the missing documents. On November 7, Shearer, Calabrese, and other IRS

agents set out to Berkowitz's home to arrest him. But despite the knowledge they had (knowledge that indisputably amounted to probable cause to arrest Berkowitz), and for reasons not apparent to us, the agents did not bother to obtain an arrest warrant.

The parties agree that when the agents arrived at the house, Shearer knocked on the door and Berkowitz opened the door to answer. At this point, their stories diverge. According to Shearer, after Berkowitz opened the front door Shearer immediately told him he was under arrest. Berkowitz did not resist or attempt to close the door; he simply asked if he could have his sports coat. An agent retrieved the coat, which was draped over a chair inside Berkowitz's house. According to Berkowitz, however, immediately after the door was opened, Shearer stepped into the house and then told Berkowitz he was under arrest. As the government presents things, the arrest preceded the agents' entry; as Berkowitz tells it, the entry preceded the arrest.

After arresting Berkowitz, Shearer asked him if there was anything he wanted. Berkowitz responded that his keys were in his office. Berkowitz started walking toward his office, and Shearer and Calabrese followed him. According to Shearer, he noticed on top of a desk in Berkowitz's office and in an alcove area under the desk numerous files and other documents (including original tax returns) that he recognized as some of the files and documents missing from the USA's office. Shearer said he was able to recognize those files and documents, in part, because his own handwriting was on some of the files. Shearer seized some of the records, and took Berkowitz away.

That day, the government obtained a warrant to search Berkowitz's home; the next day, the government obtained a warrant to search a safe in Berkowitz's house. Those searches turned up numerous documents and evidence that had been missing, including checks that had been torn up and thrown in a wastebasket. But despite those searches, the government never recovered the vast majority of missing documents.

A grand jury indicted Berkowitz, charging him with two counts of obstruction of justice, 18 U.S.C. § 1503, and one count of stealing government property, 18 U.S.C. § 641. Before trial, Berkowitz's appointed attorney, William Huyck, filed a motion to suppress the evidence found in Berkowitz's home during his arrest and the subsequent searches. Judge Bua, who presided over this case, denied the motion without holding an evidentiary hearing.

About two weeks before trial, Huyck asked the district court to continue the trial because he had had insufficient time before trial to review documents in the government's possession. Judge Bua denied the motion but urged the government to accommodate Huyck's request to review the documents. The next day, Huyck moved to withdraw so that Berkowitz could retain a new attorney. However, since the new attorney could not be ready to try the case on the date set for trial, the judge denied this motion also.

On the first day of trial, after the jury was selected and immediately before the opening statements, Berkowitz told the court that he wanted to represent himself. Judge Bua asked Berkowitz whether he was insisting on his constitutional right to represent himself. Berkowitz responded that he wanted to "waive the right to counsel, but ... not waive the right to have counsel"; in other words, he wanted to try the case himself but have standby counsel. Without inquiring any further into Berkowitz's understanding of what trying a case entailed or the disadvantages he might face by trying the case himself, the judge granted Berkowitz's requests, declaring that "based on the little I know about your background [exactly what the judge knew does not appear in the record] ... if any defendant is competent to represent himself, it is you...."

At trial, Berkowitz testified on his own behalf (with Huyck asking the questions), and admitted taking government documents out of the USA's office. However, this admission was necessary within the

context of Berkowitz's defense, which was to deny (or at least create doubt about) his intent to deprive the government of the documents or to obstruct justice. Thus, Berkowitz testified that he did not intend to obstruct the government's prosecution of his case. He took documents only because he believed that the government was withholding evidence and treating him unfairly in the tax fraud case. He testified that he intended only to copy and return the documents, and that he did in fact return many of the documents he took after copying them. He also testified that a number of the documents found at the time of his arrest were his own, not the government's, thus casting (or attempting to cast) doubt on the government's contention about how many documents he took. Berkowitz's cross-examinations of the government's witnesses (Shearer and Cook) followed this same theme.

In the end, though, the jury did not accept Berkowitz's defense, and convicted him of all three counts charged. The district court sentenced Berkowitz under the sentencing guidelines to sixty-three months imprisonment, which represented an upward departure from the sentencing guideline range that would have applied based on the severity of Berkowitz's offenses and his criminal history score.

## II. Assistance of Counsel

Berkowitz contends that we must reverse his convictions because he received ineffective assistance of counsel. According to Berkowitz, Huyck was ineffective because he failed to examine documents. Moreover, Berkowitz says that the district court effectively deprived him of counsel by denying his motion to continue the trial date and by failing to admonish him properly about the pitfalls of proceeding *pro se.*

### A. Denial of Continuance.

■ We first consider Berkowitz's contention that the district judge denied him effective assistance of counsel by denying Huyck's motion to continue the trial date. According to Berkowitz, denying the continuance left Huyck without adequate time to examine the government's documents before trial. This lack of preparation, Berkowitz says, led to his decision to proceed *pro se.*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." Normally, to show that his Sixth Amendment right to counsel has been violated, a defendant must show that deficiencies in counsel's conduct (such as poor preparation) actually prejudiced him by casting doubt on the reliability of the trial's outcome. See *United States v. Cronic,* 466 U.S. 648, 655–59, 104 S.Ct. 2039, 2044–47, 80 L.Ed.2d 657 (1984); *Strickland v. Washington,* 466 U.S. 668, 691–96, 104 S.Ct. 2052, 2066–69, 80 L.Ed.2d 674 (1984). However, in some cases where the defendant has no counsel at all, or an action by the prosecution or the trial court so hamstrings counsel as to effectively prevent counsel from actually assisting the defendant, prejudice is presumed and constitutional error is present without the defendant having to show actual prejudice. See, e.g., the cases cited in *Cronic,* 466 U.S. at 659 n. 25, 104 S.Ct. at 2047 n. 25. Berkowitz seems to be arguing that the trial judge's denial of a continuance hampered Huyck so much (by denying him adequate time to prepare) that the denial of the continuance prevented Huyck from actually assisting Berkowitz. We disagree with this characterization.

Trial judges have broad discretion in scheduling trials. Consequently, "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983). The district judge in this case did not abuse his discretion in denying the continuance motion, so that denial did not deprive Berkowitz of counsel's assistance. Huyck had almost two months (from November 14, 1988, the date of his appointment as counsel, to January 3, 1989, the trial date) to prepare for trial. He had almost two weeks from the time the trial judge denied the continuance to

the trial date. The government provided Huyck and Berkowitz with a detailed inventory of the documents it claimed were missing, and made the remaining documents available for inspection at any time. The issues in the case—essentially, whether Berkowitz stole and destroyed documents, and whether Berkowitz intended to obstruct justice—were not complex. In short, the trial judge acted well within his discretion in denying a continuance, and that denial, by itself, did not deprive Berkowitz of Huyck's effective assistance. Cf. *United States v. Blandina*, 895 F.2d 293, 297 (7th Cir.1989); *United States v. Studley*, 892 F.2d 518, 521–23 (7th Cir.1989).

*B. Failure to Examine Documents.*

 This brings us to Berkowitz's second contention concerning effective assistance of counsel: that Huyck failed to provide him effective assistance because he failed to examine documents. Adequate pretrial preparation, including the examination of documents, is essential to properly represent a criminal defendant. But how much preparation is enough (like the numerous other decisions an attorney must make in the course of representation) is a matter of professional judgment. The attorney's judgment is entitled to deference; thus, for Berkowitz to show Huyck's performance was deficient, he must overcome a "strong presumption that [Huyck's] conduct [fell] within the wide range of reasonable professional assistance" and show that Huyck's pretrial preparation fell below "an objective standard of reasonableness" based on "prevailing professional norms." *Strickland*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66; see also *United States v. Weaver*, 882 F.2d 1128, 1138 (7th Cir.1989). Moreover, even if Huyck's pretrial preparation was objectively deficient, Berkowitz must show that lack of preparation prejudiced him in the sense that a reasonable probability exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Since we presume that Huyck's performance fell within the range of reasonable professional assistance, it is Berkowitz's task to show otherwise. The only evidence Berkowitz cites concerning Huyck's preparation is a statement in a new trial motion, prepared by Huyck, that he did not seek copies of the records the government had seized. But the motion states only that Huyck did not ask for copies; it does not state that Huyck did not inspect the government exhibits. Furthermore, there are indications in the record that Huyck spent considerable time reviewing records and preparing for trial. The evidence in the record is insufficient for Berkowitz to overcome the presumption that Huyck's preparation was reasonable.

Even if Huyck's preparation was deficient, Berkowitz has failed to show prejudice from this deficiency. Berkowitz says that because Huyck did not review all the government's documents, he could not show that the government never possessed many of the documents that Berkowitz allegedly stole. Berkowitz also argues that without knowing what documents the government had left after Berkowitz's theft, Huyck could not challenge the government's assertion that the loss of the stolen documents adversely affected the government's ability to try the tax fraud case. Neither of these complaints are sufficient to establish prejudice. First, the evidence that Berkowitz did steal and destroy at least some documents was overwhelming: Berkowitz himself admitted taking documents, and the government recovered torn checks that had been stolen from a wastebasket in Berkowitz's home. Second, obstruction of justice requires the government to show only that a defendant "endeavor[ed] to impede a prosecution, not that he actually impeded the prosecution. See 18 U.S.C. § 1503. The key question at trial was Berkowitz's intent, not whether he actually impeded the tax fraud prosecution. The fact that Berkowitz actually did destroy documents and the fact that he had government documents in his house several weeks after his last visit to the USA's office raise a strong inference that Berkowitz intended to impede the tax fraud case. Why else would he keep or destroy government documents? During trial, Ber-

kowitz was able to identify numerous documents that the government claimed were stolen that had already been in his possession. But given the overwhelming evidence that Berkowitz did steal and destroy some documents, it is not reasonably probable that showing that some other documents the government claimed were stolen were not would have changed the jury's verdict.

### C. Waiver of Counsel.

■ Berkowitz's third, and potentially most substantial claim concerning assistance of counsel is his claim that the district court failed to properly admonish him about the pitfalls of representing himself. In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court held that criminal defendants have a constitutional right to self-representation. But before permitting a defendant to exercise this right, the trial judge must ensure that the defendant has knowingly and voluntarily waived his Sixth Amendment right to counsel. To do this, the judge should advise the defendant about and try to ensure he understands the benefits associated with the right to counsel, the pitfalls of self-representation, and the fact that it is unwise for one not trained in the law to try to represent himself. See *United States v. Moya–Gomez,* 860 F.2d 706, 731–32 (7th Cir.1988). In *United States v. Mitchell,* 788 F.2d 1232, 1236 n. 3 (7th Cir.1986), we stated that the district judge should engage in

> a thorough and extensive inquiry of [defendant] by asking [him] his age and degree of education; informing him of the crimes with which he was charged and the maximum possible sentences; determining that [he] underst[ands] the nature of the charges; ascertaining that he ha[s] copies of the Federal Rules of Evidence and the Federal Rules of Civil Procedure and instructing him to read them and to abide by them, whether read or not; and telling [him] that he would be expected to conduct himself in accordance with those rules.

See also *Moya–Gomez,* 860 F.2d at 732. An excellent guideline for the appropriate inquiry a district judge should conduct when a defendant announces he wants to represent himself, and a guideline consistent with our pronouncements in *Mitchell* and *Moya–Gomez,* is contained in 1 *Bench Book for United States District Judges* § 1.02 (3d ed.1986), which is reproduced as an appendix to the opinion in *United States v. McDowell,* 814 F.2d 245, 251–52 (6th Cir.1987).

It is important that district judges conduct a proper inquiry of and convey the necessary information to a defendant who wishes to represent himself. When the Supreme Court in *Faretta* announced the right to self-representation it placed trial judges between a rock and hard place. Whether the district court honors or denies the defendant's request to represent himself, the defendant is likely to appeal if he loses at trial. The appeal will almost inevitably revolve around whether or not the defendant was fully aware of his right to counsel, the benefits he receives because of that right, and the pitfalls of going alone. By conducting a formal inquiry such as the one set out in the District Judge's Bench Book, the judge will insulate the judgment from this type of attack. The trial judge is in the best position to assess whether a defendant has knowingly and voluntarily waived counsel. This court will most likely uphold the trial judge's decision to honor or deny the defendant's request to represent himself where the judge has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion about the defendant's understanding of his rights and the voluntariness of his decision. We realize that such inquiries take time. But the few minutes a proper *Faretta* inquiry normally would take is a worthwhile alternative to a new trial.

It is clear the district judge in this case did not conduct a proper inquiry concerning Berkowitz's waiver of counsel. The judge did not inform Berkowitz of the benefits of having counsel or the pitfalls of representing himself. While the judge did recite to Berkowitz the old saw that "a lawyer [who] represents himself ... has a fool for a client," this hardly constitutes the kind of

searching inquiry we spoke of in *Mitchell* and *Moya–Gomez*. But on appeal Berkowitz makes little of this shortcoming. He raised the *Faretta* issue as almost an afterthought, devoting only one sentence in his brief to this issue, not even attempting to explain what a proper inquiry should entail, and citing no pertinent authority to support his "argument." His nonchalant treatment of the omission on appeal leads us to conclude he considers the inquiry of little consequence. We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues). See, e.g., *United States v. Brown*, 899 F.2d 677, 679 n. 1 (7th Cir. 1990); *United States v. Petitjean*, 883 F.2d 1341, 1349 (7th Cir.1989); *United States v. Williams*, 877 F.2d 516, 518–19 (7th Cir. 1989); Fed.R.App.P. 28(a)(4).

Given the complete lack of inquiry by the district judge, we might be willing to forgive Berkowitz's waiver but for one point: a failure to make a proper inquiry of a defendant who asks to represent himself, by itself, is not necessarily reversible error. The real question when a criminal defendant waives counsel is not the quality of the trial judge's inquiry; rather, it is whether the defendant knowingly and voluntarily waived his right to counsel. Thus, if a formal inquiry is deficient, or even lacking, we will not reverse the defendant's conviction if the record as a whole demonstrates the defendant knowingly and voluntarily waived his right to counsel. See *Moya–Gomez*, 860 F.2d at 733 (citing cases).

Berkowitz did not argue in his opening brief how the record as a whole does not show that his waiver of counsel was not knowing and voluntary. In fact, he did not mention this necessary analysis of the record or even assert that his waiver was *not* knowing and voluntary. He cited no pertinent authority on the point. The government in its response brief thoroughly analyzed the record to attempt to demonstrate that Berkowitz's waiver of counsel was knowing and voluntary, and cited authority to support its legal analysis. De-

spite the government's argument, Berkowitz ignored the waiver of counsel issue in his reply brief and at oral argument, making no attempt to refute the government's analysis either legally or factually.

A party urging us to reverse a district court's judgment has an obligation to argue why we should reverse that judgment, and to cite appropriate authority to support that argument. See *Brown*, 899 F.2d at 679 n. 1; see also *Beard v. Whitley County REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988). "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983) (Scalia, J.). It is not this court's responsibility to research and construct the parties' arguments. *Williams*, 877 F.2d at 518; *Beard*, 840 F.2d at 408–09. Since Berkowitz has chosen not to argue that his waiver of counsel was not knowing and voluntary, even despite the government's argument that it was, he has waived the issue.

In any event, there are several indications in the record that Berkowitz knowingly and voluntarily waived his right to counsel. Berkowitz is a college graduate. He knew he had the right to be represented by counsel, and affirmatively asked to represent himself. He understood the distinction between having counsel and being represented by counsel; while he asked to conduct the trial himself, he insisted that Huyck stay in the case as standby counsel. Not only did Berkowitz actively participate in the discovery process of the tax fraud case, but he also had represented himself in a prior civil action, so he had prior experience with judicial procedures. Moreover, Berkowitz's trial conduct demonstrated a fairly sophisticated understanding of the judicial process. Berkowitz made several evidentiary objections that the district court sustained. He also was able to cross-examine the government's witnesses on the subtleties of the best evidence rule, Northern District of Illinois Local Rule 2.04, Fed. R.Crim.P. 16, and the Jencks Act. While

the district judge should have conducted a much more searching inquiry concerning Berkowitz's waiver of counsel, the facts we have noted are enough to demonstrate that Berkowitz's waiver was knowing and voluntary, at least absent any assertion by Berkowitz otherwise.

### III. Arrest and Search

Berkowitz next asserts that the district court should have suppressed the evidence found in his home during his warrantless arrest and during the searches of his home the following day. (According to Berkowitz, information derived from the documents seized at the time of arrest was used in the affidavit Shearer submitted to obtain a search warrant; the government does not—at least now—contest this assertion.). Berkowitz posits three reasons why the district judge should have suppressed this evidence. First, Berkowitz argues that Shearer and other IRS agents illegally arrested him in his home without a warrant. Second, Berkowitz argues that even if the arrest was lawful, IRS agents had no right to follow him into his office, where they found the documents. Finally, Berkowitz argues that even if the agents had a right to be in his office, the documents Shearer seized were not seizable under the plain view exception to the warrant requirement because it was not readily apparent that those documents were among the ones Berkowitz stole.

### A. *Arrest at Berkowitz's Home.*

■ The district judge denied the suppression motion without holding an evidentiary hearing because he found that Berkowitz had "failed to identify any factual dispute relevant to the disposition of the motion." But there was, as we have seen, a factual dispute concerning Berkowitz's arrest. The government claimed (supported by an affidavit by Shearer) that the IRS agents asserted their authority to arrest before entering Berkowitz's home, and that Berkowitz did not resist their authority; only after this did the agents enter the home to complete the arrest. On the other hand, Berkowitz claimed (supported by his own affidavit) that Shearer and the other

IRS agents entered his home before informing him he was under arrest.

Despite this factual conflict, the district court was obliged to hold a hearing only if the difference in facts is material, that is, only if the disputed fact makes a difference in the outcome. See *United States v. Rollins,* 862 F.2d 1282, 1291 (7th Cir.1988); *Nechy v. United States,* 665 F.2d 775, 776 (7th Cir.1981); see also *United States v. Sophie,* 900 F.2d 1064, 1071–72 (7th Cir. 1990). Whether the factual conflict here is material depends on whether the arrest's legality differs under the different versions of facts. If the arrest was legal under either version of the facts, we must affirm the district court; if the arrest was illegal under either version of the facts, we must reverse. Only if the arrest was legal under the government's facts but illegal under Berkowitz's must we remand for an evidentiary hearing.

Generally, police may not enter a person's home to arrest that person without an arrest warrant, unless exigent circumstances exist. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); see also *Minnesota v. Olson,* —— U.S. ——, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990); *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). The Fourth Amendment protects a person's reasonable expectation of privacy in a variety of settings, but the chief evil against which the amendment is directed is the physical entry of the home. See *Payton,* 445 U.S. at 585, 589, 100 S.Ct. at 1379, 1381. "In [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home...." *Id.* at 589, 100 S.Ct. at 1381. Thus, the Court held in *Payton,* the Fourth Amendment draws "a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. at 1382.

A few years before deciding *Payton,* however, the Supreme Court had held in *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), that po-

lice could arrest without a warrant a person standing in the open doorway to her home because the open doorway was a public place. In *Santana*, police saw "Mom" Santana standing in the open doorway to her home shortly after a heroin transaction they had probable cause to believe she participated in. The police pulled their van up near her home, exited the van, identified themselves, and approached Santana to arrest her. Santana fled into her home; the police followed and arrested her. *Id.* at 40–41, 96 S.Ct. at 2408–09.

The Supreme Court upheld Santana's arrest. First, the Court held Santana had no reasonable expectation of privacy standing in her open doorway: "She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* at 42, 96 S.Ct. at 2409. Thus, the police could arrest Santana in her doorway under the Court's decision in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), that police with probable cause to arrest may arrest a person in a public place without a warrant.

The police, however, were not actually able to complete Santana's arrest in her doorway; they had to enter her home to bring her under their control. The Court upheld the arrest in the home, not because the home was a public place, but because Santana could not thwart an arrest begun in a public place (her open doorway) by retreating into her house. *Id.* 427 U.S. at 42–43, 96 S.Ct. at 2409–10. The entry into Santana's home was justified by an exigent circumstance: the police's "hot pursuit" of a fleeing felon. See *id.*

If Berkowitz's arrest occurred as the government says it did, the arrest was legal. Courts have generally upheld arrests such as that described by Shearer in this case, where the police go to a person's home without a warrant, knock on the door, announce from outside the home the person is under arrest when he opens the door to answer, and the person acquiesces to the arrest. See, e.g., *McKinney v. George*, 726 F.2d 1183, 1188 (7th Cir.1984); *United States v. Carrion*, 809 F.2d 1120,

1128 (5th Cir.1987); *United States v. Whitten*, 706 F.2d 1000, 1015 (9th Cir.1983); *United States v. Botero*, 589 F.2d 430 (9th Cir.1978); see generally 2 Wayne R. La Fave, *Search and Seizure* § 6.1(e), at 589–61 (2d ed. 1987). While most of these cases have justified their holdings as applications of *Santana*, the arrests in these cases, and the arrest here as Shearer presents it, are consistent with *Payton*. It is true that Berkowitz was still standing inside his home when Shearer told him he was under arrest. But *Payton* prohibits only a warrantless *entry* into the home, not a policeman's use of his voice to convey a message of arrest from outside the home. See La Fave, *supra*, § 6.1(e) at 590. Moreover, there is nothing in *Payton* that prohibits a person from surrendering to police at his doorway. *Id.* The agents in this case (even as Shearer tells it) did enter Berkowitz's house (remaining immediately adjacent to his doorway) after Shearer told Berkowitz he was under arrest. But from Shearer's affidavit, it appears Berkowitz submitted to the agents' authority to arrest him before they entered. For reasons we will explain shortly, we do not think the agents' entry (if the facts are as Shearer states) violated any reasonable privacy expectation of Berkowitz's, and therefore did not violate *Payton*.

As Berkowitz presents the arrest, however, Shearer and the other IRS agents entered his home *before* announcing he was under arrest. One might argue that this should not make a difference; Berkowitz was standing at or near his doorway, and *Santana* says the doorway is a public place. Moreover, one might argue that a search's legality should not turn on such subtle distinctions as whether the police announce an arrest before entering a home, or wait until after entry to announce the arrest (so long as the police stay near the doorway). We find these arguments unpersuasive for several reasons.

*Payton* holds the Fourth Amendment draws a clear line at the entrance of a person's house: "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. at 1382. Entering a person's

home without a warrant to arrest him, where no exigent circumstances exist, violates this clear command. The government has not cited any "knock and arrest" cases upholding arrests where the police entered the arrestee's home before telling the person he was under arrest. The Fourth Circuit has recently held that a warrantless nonconsenual entry into a hotel room to arrest a subject who answered a knock at his door and was standing near the door when the police entered violates *Payton*. *United States v. McCraw*, 920 F.2d 224, 228–30 (4th Cir.1990). A case from this circuit also indicates that such an arrest would be illegal. In *United States v. Diaz*, 814 F.2d 454 (7th Cir.1987), an undercover officer was in Diaz's hotel room testing cocaine he was supposed to buy from Diaz. The officer told Diaz the cocaine was acceptable, and left the room purportedly to call his "money man." After leaving the room, the officer gave a signal to other officers stationed near the room. The first officer then went back to the room, and knocked on the door. When Diaz answered, the other officers entered the room and arrested him. See *id.* at 456. This court upheld the search on the basis of Diaz's original consent to the first officer to be in the hotel room. But although Diaz was at the doorway to his hotel room when the other officers entered and arrested, we held there were no exigent circumstances to justify the entry, thus indicating that absent Diaz's consent to the first officer the warrantless entry to arrest Diaz would have violated the Fourth Amendment as interpreted in *Payton*. See *id.* at 458–59.

That warrantless entry before arrest is not legal (and, conversely, that a slight entry after the defendant has submitted to the police is legal) can be seen from analyzing the privacy interests involved in the situation. The Fourth Amendment protects people's legitimate expectations of privacy. A person's subjective privacy expectation in any situation is legitimate, and therefore worthy of Fourth Amendment protection, if it is "one that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 110 S.Ct. at 1687 (citation omitted).

As the Court noted in *Payton*, there is no place where a person's expectation of privacy is greater than in his own home. See *Payton*, 445 U.S. at 589, 100 S.Ct. at 1381. A person does not abandon this privacy interest in his home by opening his door from within to answer a knock. Answering a knock at the door is not an invitation to come in the house. We think society would recognize a person's right to choose to close his door on and exclude people he does not want within his home. This right to exclude is one of the most—if not the most—important components of a person's privacy expectation in his home.

When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in effect, has forfeited the privacy of his home to a certain extent. At that point, it is not unreasonable for the police to enter the home to the extent necessary to complete the arrest. A person who has submitted to the police's authority and stands waiting for the police to take him away can hardly complain when the police enter his home briefly to complete the arrest. This is why, if Shearer's version of the arrest is true, it would not have violated the Fourth Amendment for Shearer and the other agents to enter Berkowitz's house after announcing the arrest, and remain near his door, to take Berkowitz under their control.

It is a different matter, however, for the police to enter a person's home, without his consent, before announcing their authority to arrest. In that case, the arrestee has not forfeited his privacy interest in the home; he has not relinquished his right to close the door on the unwanted visitors. See *McCraw*, 920 F.2d at 229; see also *McKinney v. George*, 726 F.2d at 1188 (suggesting that a person answering the police's knock may retreat into his home, and that police may not then enter without a warrant to arrest him); *La Fave, supra*, § 6.1(e) at 591. Indeed, the police have not even given him a chance to exercise that right. *Payton* holds that police may not

enter a person's home without a warrant to arrest him; to hold it was proper for Shearer and his cohorts to enter Berkowitz's home in this case before announcing his arrest would be to sanction the very conduct that *Payton* holds the Fourth Amendment forbids.

*Santana* does not require a different result. As far as reasonable privacy expectations go, there is a significant difference between a person who for no reason voluntarily decides to stand in his open doorway, and a person who merely answers a knock on his door. The person who answers the knock and stays within the house is not voluntarily exposing himself "to public view, speech, hearing, and touch as if [he is] standing completely outside [his] house." *Santana,* 427 U.S. at 42, 96 S.Ct. at 2409. Moreover, the entry in *Santana* was justified by hot pursuit; Santana had just completed a heroin transaction, she voluntarily relinquished her privacy expectation in her home by exposing herself to the public in her open doorway, the police began the arrest while Santana had no reasonable privacy expectation, and there was a real possibility that delaying her arrest would result in her destroying evidence. See *id.* at 42–43, 96 S.Ct. at 2409–10. In this case, there was no justification for Shearer and the other agents to enter Berkowitz's home to arrest him without a warrant.

One might argue that to disallow the minimal entry into the home to arrest in this case could hamstring police. But *Payton* forbids any non-consensual warrantless entry into the home absent exigent circumstances. *Payton* did not draw the line one or two feet into the home; it drew the line at the home's entrance. Also, if police go to a person's home to arrest him, and have reason to believe they may have to enter the home to make the arrest, they should obtain a warrant. There was no reason in this case for Shearer and his cohorts not to get a warrant, and plenty of reason to obtain a warrant. What would have happened if Berkowitz had refused to open his door to the police? Or if another member of Berkowitz's family had answered the door, but Berkowitz refused to come to the door? The agents would have had to go back and get a warrant (after having effectively warned Berkowitz that they suspected him of stealing documents, something that would have created a real danger that Berkowitz would destroy evidence or try to flee). Obtaining a warrant in the first place would have prevented these potential problems, to say nothing of the time it would have saved at trial and on appeal litigating the legality of Berkowitz's arrest.

Because there is a factual dispute in this case, and because resolving that dispute is necessary to determine whether Berkowitz's arrest was legal, the district judge should have held an evidentiary hearing. Therefore, we must reverse and remand so that the judge may hold that hearing.

### B. *Plain View Seizure of Documents.*

 There are two other questions we must answer concerning Berkowitz's motion to suppress, assuming that if on remand the court determines Berkowitz's arrest was legal. Both center around whether Shearer legally seized documents from Berkowitz's home office at the time of his arrest. Since Shearer did not have a warrant to seize those documents, the seizure was proper only under the plain view exception to the warrant requirement. A warrantless seizure is justified under the plain view doctrine if the officer has a legal right to be in the place from where he sees the object subject to seizure and "a lawful right of access to the object itself," and if " 'the object's incriminating nature is immediately apparent.' " *Horton v. California,* —— U.S. ——, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). The two questions we must answer (assuming the arrest to be legal) are whether Shearer had a right to be in Berkowitz's office when he discovered the documents, and whether it was "immediately apparent" to Shearer that those were government documents. (There is no dispute, assuming Shearer's presence in the office was legal, about whether Shearer had a lawful right of access to the documents he seized, since they were lying in the open in a place he had a right to be.)

There is no material factual dispute about Shearer's presence in Berkowitz's office. Both parties agree that Berkowitz told the agents that he wanted to get his keys, and that Shearer followed Berkowitz into his office where his keys were. While the government asserts that Berkowitz consented to being followed and Berkowitz asserts he did not consent, this factual dispute is unimportant. In *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), the Supreme Court held that when police lawfully arrest a person, they may follow that person into his home to monitor him, and seize any contraband they find in plain view. That is exactly what occurred here. The officer's authority to monitor a suspect does not depend on the suspect's consent; a suspect under arrest has no right to wander off on his own. Thus, the district court correctly held that Shearer could legally follow Berkowitz into his office.

The second requirement, that an object's incriminating nature be "immediately apparent," is met where a police officer, upon seeing the object, has probable cause to believe the object is contraband or evidence of a crime. *Arizona v. Hicks*, 480 U.S. 321, 327, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987). In this case, Shearer stated in his affidavit he observed "numerous files" on top of the desk in Berkowitz's office and under the desk's alcove area. Shearer stated that he "immediately recognized" the files as those that had been stored in the USA's office. He knew the files were from the USA's office because, among other things, he recognized his own handwriting on some of the files. Shearer also stated that he saw some original income tax returns.

Shearer's affidavit is sufficient to show that it was "immediately apparent" to him the files he saw in and seized from Berkowitz's office were taken from the USA's office. Berkowitz, however, disputes several of the facts in Shearer's affidavit.

The question, therefore, is whether these disputed facts are material, so that the district court should have taken evidence concerning the seizure.

None of the factual disputes concerning the documents' seizure is material. Berkowitz states that it would not have been immediately apparent from looking at any files on his desk that they were government files. However, Berkowitz cannot contest what would have been apparent to Shearer (who was the agent responsible for investigating the tax fraud case) just by baldly asserting what he thinks would have been apparent.

Berkowitz also stated that there were no papers in the alcove area under his desk. But Shearer stated he saw files in the alcove area, not papers. In any event, even if Shearer was mistaken about seeing files in the alcove area, the fact remains that Shearer did seize files from Berkowitz's office that were in plain view. Any dispute about precisely where Shearer actually found the files is not relevant to the question of whether it was immediately apparent to Shearer that the files he did find were government files.

Finally, Berkowitz stated that there were no original tax returns on top of his desk. However, Berkowitz does not contest that Shearer actually seized original tax returns. Even if those tax returns were in the files, they were seizable because the files themselves were seizable. Berkowitz does not dispute that Shearer's handwriting was on the files, or that there were other reasons for him to recognize the files. Thus, the fact that there may have been no original tax returns on top of the desk is not material to whether Shearer legally seized the documents he found in plain view in Berkowitz's office. Since there is no material factual dispute concerning Shearer's seizure of documents at the time of the arrest, if Berkowitz's arrest was legal, the seizure of the documents was legal.[1]

---

1. If Berkowitz's arrest was not legal, it follows that Shearer had no right to follow Berkowitz into his office, and we could not uphold the seizure of the documents on the basis that *Chris-* *man* allowed Shearer to be in the office where he saw the documents in plain view. However, nothing in this opinion prevents the government from arguing any other theory to uphold the

**1390**

## IV. Sentencing

### A. Offense Level Increase for Destroying Documents.

■ Since Berkowitz's conviction may still stand after the district court holds an evidentiary hearing concerning his arrest, we consider Berkowitz's challenges to his sentence. Berkowitz first argues that the district court erred by increasing his offense level for the obstruction of justice counts eight levels because he destroyed documents. Sentencing Guideline § 2J1.2(b)(1) provides for an eight-level increase for obstruction of justice offenses "[i]f the defendant obstructed or attempted to obstruct justice by causing or threatening to cause physical injury to a person or property...." Berkowitz argues that § 2J1.2(b)(1)'s eight-level increase applies only when property damage is used to intimidate a witness or inflict emotional distress. That is not, however, what the guideline says, and there is nothing in the commentary to § 2J1.2 to support Berkowitz's argument. Section 2J1.2(b)(1) provides for an eight-level increase where the offense involves property damage; since Berkowitz destroyed government documents, that increase applies here.

### B. Amount of Loss.

■ Berkowitz next argues that the district court erred by increasing the offense level for his theft conviction by eight levels. Guideline § 2B1.1 provides a base offense level of four for theft, and then increases the offense level as the amount of loss from the theft rises. For losses between $100,001 and $200,000, § 2B1.1(b)(1)(I) provides for an eight-level increase. Berkowitz argues that the government did not introduce sufficient evidence to support the district judge's finding that the government's loss from his theft amounted to more than $100,000.

Section 2B1.1, Application Note 2, provides that "loss" ordinarily means the market value of the property stolen. However, "[w]here the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim." *Id.* The government estimated that the replacement cost of the documents Berkowitz stole would be more than $100,000. The government based its estimate on the effort it would take to duplicate the missing documents, including the time at least a dozen banks would have to spend duplicating documents, and the time the government would have to spend reorganizing the documents, reinterviewing witnesses, obtaining new copies of documents the witnesses had previously supplied, and recopying stolen undercover tape recordings. Time is money, and the value of the labor involved in replacing the stolen documents is part of the cost of replacing them. Moreover, time a person spends doing one thing is time that person cannot spend doing something else; therefore, opportunity costs must also be factored into the cost of replacing the documents. "[L]oss need not be determined with precision, and may be inferred from any reasonably reliable information available...." Guideline § 2B1.1, Application Note 3. Given that Berkowitz produced no evidence to challenge the government's assertions about replacing the documents, those assertions were sufficient to support the trial judge's finding that the loss exceeded $100,000.

Berkowitz also argues that the district court in determining the amount of loss should have considered the government's failure to mitigate. This argument is meritless. Berkowitz's crime is the same whether or not the government mitigated its loss, and the government's lack of mitigation is irrelevant to Berkowitz's culpability. Besides, Application Note 2 indicates that mitigation is not required. For example, the note provides that if a defendant steals a car, the loss refers to the value of the car even if the vehicle is recovered immediately. In that case, the victim's true loss is the value of not having his car

seizure (e.g., inevitable discovery) if the district court finds Berkowitz's arrest illegal. We express no view about whether any other theory

the government might argue would be successful.

for a certain amount of time, and any other losses flowing from not having the car. In the case where the car is returned immediately, that loss is likely to be very small. Yet, loss is still measured by the car's market value. Similarly, even though the government might have been able to mitigate its loss, the loss should still be measured by the value of the documents stolen—in this case, the documents' replacement cost.

### C. Upward Departure.

■ Berkowitz next argues that the district court erred by departing upward from criminal history category I (the category based on Berkowitz's prior criminal record) to category III. Guideline § 4A1.3 provides that "if the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes" the court may depart upward. As an example of the kind of information the judge may consider in deciding to depart upward, § 4A1.3(d) provides that the judge may consider "whether the defendant was pending trial ... on another charge at the time of the instant offense." Section 4A1.3 then gives as an example of when a departure is warranted "the case of a defendant who ... committed the instant offense while on bail or pretrial release for another serious offense."

The district judge quite logically applied the straightforward language in § 4A1.3 and departed upward because "Berkowitz committed the instant offenses while serious tax fraud and mail fraud charges were pending against him, and after he had been released on bond." But despite § 4A1.3's straightforward language, Berkowitz argues that the departure was unwarranted because the tax fraud case and this case were so closely related that the fact he stole the documents while out on bond for the tax fraud case indicates nothing about his likelihood of committing future crimes. We disagree. Most criminal defendants do not try to impede their prosecutions by stealing and destroying government evidence. Perhaps they realize stealing and

destroying evidence would be wrong. More likely they realize that attempts to impede the prosecution will only land them in bigger trouble than they are already in. But neither the fact that such action was wrong nor the fact that his attempt to impede the prosecution could have serious adverse consequences deterred Berkowitz from stealing and destroying government documents. Given this, it is reasonable to conclude that Berkowitz might be more likely than the average offender to resort to crime in the future if he thought it to be to his advantage.

Berkowitz attempts to make two other arguments concerning the upward departure. First, he states that since 18 U.S.C. § 3147 and Guideline § 2J1.7 "cover" the commission of offenses while on bond, the court may not properly depart under § 4A1.3. Second, he states that the district judge did not follow a proper procedure in deciding to depart to criminal history category III. Since his argument concerning 18 U.S.C. § 3147 and Guideline § 2J1.7 is a perfunctory two-sentence argument that does not explain how those provisions "cover" this situation, and that cites no applicable authority, he has waived it. See *United States v. Petitjean*, 883 F.2d at 1349. He has also waived his procedural argument because he raised it for the first time in his reply brief. See Fed.R.App.P. 28; Seventh Circuit Rule 28(f); *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253 n. 2 (7th Cir.1989).

### D. Failure to Depart Downward.

■ Berkowitz finally argues that the district court should have departed downward from the otherwise applicable guideline range because of a psychiatrist's testimony about Berkowitz's mental state at the time of his offense. However, we have no jurisdiction to review a district court's decision not to depart, *United States v. Franz*, 886 F.2d 973 (7th Cir.1989), and thus may not consider this argument.

### V.

To sum up: We reject Berkowitz's claims that he received ineffective assistance of

counsel at trial and that the trial judge deprived him of assistance of counsel. We also hold that Berkowitz's sentence was proper. However, we reverse and remand this case to the district court to hold an evidentiary hearing concerning Berkowitz's arrest. Circuit Rule 36 shall not apply on remand.

COFFEY, Circuit Judge, concurring in part and dissenting in part.

## I. Waiver of Counsel

Based on the record as a whole, I believe that the defendant made a knowing and intelligent waiver of counsel. In addition, I concur with that part of the majority opinion holding that Berkowitz has waived any waiver of counsel issue in light of the fact that he chose not to properly raise the issue before this court. This court has previously stated that "[a]n issue expressly presented for resolution is waived if not developed by argument." *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988) (citing *Hunter v. Allis Chalmers*, 797 F.2d 1417, 1430 (7th Cir.1986)). The dissent's statement that "[t]he panel's 'one-sentence' characterization is, in my view, inaccurate" is itself inaccurate. Berkowitz's treatment of the waiver of counsel issue in his opening brief consists of only the following:

> "In doing so the district court did nothing to admonish Berkowitz about the benefits of having trained legal counsel and advising him of the sixth amendment rights he had by being defended by counsel. The combination of Mr. Huyck's failure to inspect all the documents and the court's lack of admonition concerning attempting to try the case himself deprived Berkowitz of his right to effective assistance of counsel."

With the exception of this cursory treatment of the issue in his opening brief, Berkowitz has chosen to ignore the issue entirely. "[A]n appellant is required by Rule 28(a)(4) of the Federal Rules of Appellate Procedure to present in his brief to the appellate court the issues that he desires to litigate and to support his argument on those issues with judicial authority."

*United States v. Brown*, 899 F.2d 677 n. 1 (7th Cir.1990) (citing *Zelazny v. Lyng*, 853 F.2d 540, 542 n. 1 (7th Cir.1988)). Berkowitz failed to address the waiver of counsel issue in his reply brief and at oral argument in spite of the government's thorough analysis of the issue in its response brief. Therefore, I am of the opinion that Berkowitz has waived this issue. (I would assume that Berkowitz's failure to address the issue in the face of the government's thorough analysis suggests that Berkowitz himself believes the argument is without merit.)

Instead, the dissent developed the two-sentence statement into an argument on Berkowitz's behalf, and cast aspersions on the seasoned trial judge and two of his fellow appellate judges assigned to the panel. If the dissent really believes the waiver of counsel issue has merit and wishes to argue on behalf of Berkowitz, it should acknowledge that Berkowitz did not properly raise the issue. As an experienced former trial judge, I disagree with the dissent and write separately to underscore my belief that the defendant made a knowing and intelligent waiver of his right to counsel.

Our review of the question of whether a defendant's decision to proceed *pro se* was made knowingly and intelligently depends not only on the inquiry made by the district court, but also the totality of the circumstances:

> "Although we stress the need for a thorough and formal inquiry as a matter of prudence and as a means of deterring unfounded claims on appeal, we shall not reverse a district court where the record as a whole demonstrates the defendant knowingly and intelligently waived his right to counsel. *See Mitchell*, 788 F.2d at 1235. '*A determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.*' *Johnson* [*v. Zerbst*], 304 U.S. [458] at

464, 58 S.Ct. [1019] at 1023 [82 L.Ed. 1461 (1938) ]."

*United States v. Moya–Gomez,* 860 F.2d 706, 733 (7th Cir.1988) (citations omitted) (emphasis added). The author of *Moya–Gomez* is now dissenting on this very same issue in the case before us, and in the process, the dissent engages in an unwarranted attack on his fellow appellate judges, accusing his brethren of failing to apply precedent "in a straightforward, principled manner" hoping thereby "that the reader will be seduced into accepting the whole as greater than the sum of its parts." What makes the dissent's harsh and unfounded criticism all the more difficult to understand is the fact that his argument on behalf of Berkowitz is without merit. It is beyond comprehension to understand why the dissent chooses to carry a feeble case for waiver of counsel to such great lengths, when in *Moya–Gomez* he authored the opinion upholding the waiver of counsel on facts that are troublesome and less convincing than the facts in the case before us.

In *United States v. Moya–Gomez, supra,* the defendant was accused of heading an extensive cocaine network and proceeded *pro se* without standby counsel after the district court placed a $40,000 cap on attorneys' fees that would not be subject to forfeiture under the continuing criminal enterprise statute. 21 U.S.C. § 853(c). The defendant chose to proceed without an attorney despite the fact that he faced life imprisonment if he was convicted on all counts. Moreover, the defendant was unable to understand English and required the services of an interpreter during the proceedings. After a month-long trial, the defendant was found guilty and sentenced to 70 years imprisonment.

On appeal, this court (with the dissent in the case before us authoring the opinion of the court) determined that the defendant's waiver of counsel was valid, despite "the limited scope of [the district court's] inquiry." *Id.* at 736. The court found that several factors "weigh[ed] on the side of finding waiver." *Id.* First, the court cited the factor that the record established that the defendant understood the dangers and disadvantages of self-representation, citing an October 27, 1986, hearing in which Mr. Cagney, the attorney whom the defendant initially wanted to represent him, stated that he "tried to explain" to the defendant some of the pitfalls to self-representation. However, the court overlooked the significance of the following exchange between the district court and the defendant at the October 27, 1986, hearing:

"THE COURT: Is that what you still want to do here, [represent yourself]?

THE INTERPRETER (FOR THE DEFENDANT): It is my great desire that Mr. Cagney would represent me. But if your decision is no, then I will proceed on my own. I asked him if he still wants to reinforce the decision to represent himself and he says I really don't know at this point. *There's confusion, he says, in my head.*"

*Id.* at 733 (emphasis added). Thus, based upon the record, it is far from clear that the defendant understood the dangers and disadvantages of self-representation, given his "confusion" at the time. Moreover, the defendant claimed on appeal that he was unable to understand the court-appointed interpreter.

A second factor the court relied on in finding a valid waiver of counsel was "the background and experience of the defendant." *Id.* at 736. The court cited the record as indicating that the defendant had a prior felony conviction as well as "numerous contacts with the law in connection with related offenses." *Id.* Thus, the court determined that the defendant was "no stranger to the criminal justice system." *Id.* However, it did so while explicitly acknowledging that "the district court did not specifically question [the defendant] about his background." *Id.*

The final factor the court relied on in determining that the defendant made a valid waiver of counsel was "the context of the defendant's decision to proceed *pro se.*" *Id.* at 736. The court found that the defendant's decision was in response to the district court's resolution of the attorneys' fees question and thus a "tactical one."

*Id.* However, there is evidence in the record that the defendant's decision to proceed *pro se* was made because he was under the misapprehension that he had to do this to preserve the forfeiture issue relating to attorneys' fees for appeal. The court stated:

"If [the defendant] was under this misapprehension, then clearly his waiver of counsel was not made knowingly and intelligently. We note that Mr. Cagney's statements may be interpreted as manifesting a belief that proceeding *pro se* was necessary to preserve the issue. However, these statements also simply may manifest the litigation tactic to bolster [Mr. Cagney's] argument on the forfeiture question. In any event, we must consider the possibility that Mr. Cagney misled [the defendant] about his rights in order to force a decision by either the district court or this court on the forfeiture question." *Id.* at 737 (citations omitted).

Nevertheless, the court found and the court of appeals approved that the defendant, who could neither speak nor understand the English language, was not "confused about his rights." *Id.* at 738.

Unlike the record in *Moya–Gomez*, the record in our case presents a very strong argument for a valid waiver of counsel. "The majority of courts that have considered the issue have agreed that the ultimate question is not what was said or not said to the defendant but rather whether he in fact made a knowing and informed waiver of counsel." *Moya–Gomez* at 733 (citations omitted). While I agree that the district court in our case did not conduct an inquiry as in-depth as it should and might have regarding the issue of whether Berkowitz's decision to proceed *pro se* was intelligently and knowingly made, nonetheless, the record as a whole clearly demonstrates that Berkowitz, as a college graduate with master's training and an intelligent *pro se* litigator well versed in the English language, clearly understood the potential problems associated with self-representation. Thus, based on the "background, experience, and conduct" of Berkowitz, I am convinced that he made a

knowing and informed waiver of counsel. *Moya–Gomez*, at 733.

As an example, the initial exchange at trial between Berkowitz and the trial judge regarding his decision to proceed *pro se* reveals that Berkowitz understood the difference between self-representation and having standby counsel:

"MR. HUYCK (STANDBY COUNSEL): Mr. Berkowitz has a request he would like to make, Judge.

MR. BERKOWITZ: Your Honor, I would like henceforth to represent myself but retain counsel.

THE COURT: Well, you have an absolute constitutional right to represent yourself pro se, obviously. Do I understand that you are insisting on your constitutional right to represent yourself?

MR. BERKOWITZ: *I would like to make a distinction between the right to be represented by counsel and the right to have counsel. I would like to represent myself, and in that regard I waive the right to be represented by counsel, but I do not waive the right to have counsel.*

THE COURT: To have standby counsel, is that correct?

MR. BERKOWITZ: Yes.

THE COURT: Does the government have an objection?

MR. HELWIG (ASST. U.S. ATTORNEY): Mr. Huyck would like to be standby counsel?

THE COURT: Apparently. Would he be making the opening statements?

MR. BERKOWITZ: Yes.

THE COURT: And the closing statements?

MR. BERKOWITZ: Yes.

MR. HELWIG: The only problem is when he is going to testify, we will have an opportunity at cross-examination, obviously?

THE COURT: Obviously.

MR. HELWIG: He would be testifying through his examination of witnesses?

THE COURT: You are not going to say something in your opening statement or your closing statement that you

don't intend to prove through credible evidence, is that correct?

MR. BERKOWITZ: That's correct.

THE COURT: Fine, by all means. And I find, based on the little I know about your background, that if any pro se defendant is competent to represent himself, it is you, Mr. Berkowitz, and I have no problem with it at all, provided that, as you request, Mr. Huyck stand by as standby counsel. Very well.

MR. BERKOWITZ: Thank you."

(Emphasis added).

On the second day of the trial, the trial judge again addressed Berkowitz's decision to proceed *pro se:*

"THE COURT: Have you, Mr. Berkowitz—here again, perhaps this is another good time to say it: While you do have the constitutional right, absolute constitutional right, to represent yourself, the old saying is—

MR. BERKOWITZ: I have heard it, your Honor.

THE COURT: —If a lawyer represents himself or herself, that lawyer has a fool for a client.

MR. BERKOWITZ: But I've only heard it applied to lawyers, your Honor.

THE COURT: O.K., and again, I reiterate, I think—

MR. BERKOWITZ: *I have been consulting with counsel, though, as to the correct method of cross-examination.*

THE COURT: Obviously I see you are making an attempt. Do you understand that the distinction between arguing to the jury that so and so and testimony under oath? (sic)

MR. BERKOWITZ: Yes, your Honor.

THE COURT: Do you understand that? You will try to work within those structures, will you?

MR. BERKOWITZ: Absolutely." [1]

(Emphasis added.)

Both of these dialogues between Berkowitz and the district court clearly demonstrate that Berkowitz possessed a clear understanding of the ramifications relating to his decision to proceed *pro se*, and that he weighed the pros and cons before making his final determination. His statement that he wanted to "waive the right to be represented by counsel but ... not waive the right to have counsel" demonstrates that Berkowitz clearly understood and wished to make use of the distinction between self-representation and having standby counsel. Also, Berkowitz stated that he was prepared to work within the "structures" set out by the court regarding the rules of evidence.

A review of the Berkowitz's trial conduct and questioning demonstrates most convincingly that he orchestrated and conducted his defense capably. Berkowitz made an opening statement, cross-examined government witnesses, called and examined defense witnesses and made his own closing argument. He also made a number of evidentiary objections, several of which were sustained. In my opinion, Berkowitz's trial performance would have been upheld under a *Strickland* analysis had he been a licensed practitioner of the bar representing a defendant in a similar case.

However, the dissent states:

"[T]he defendant's actual performance at trial raises great questions about whether he appreciated the magnitude of the task he had taken on. During the course

---

**1.** This exchange reveals that Berkowitz interrupted the trial court as the court was attempting to inform Berkowitz of the dangers of self-representation. While the "trial judge need not give a hypothetical lecture on criminal law," he should at least be given a chance to address the defendant free of interruptions (no matter how witty and intelligent) on the ramifications of the defendant's decision to proceed *pro se. Moya-Gomez* at 732 (citations omitted). One factor courts consider in determining whether there has been a valid waiver is whether the defendant was attempting to delay or manipulate the

proceedings. "Evidence of manipulation or intentional delay implies a greater understanding of the proceedings and an understanding of the risks and complexities of a criminal trial." *Moya–Gomez* at 737, quoting *McQueen v. Blackburn,* 755 F.2d 1174, 1178 (5th Cir.) *cert. denied,* 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985). Given the intelligence and general knowledge and experience of the defendant, this interruption of the trial court might very well have been an attempt to preserve the waiver of counsel issue on appeal.

of his direct and cross-examination (assisted by standby counsel), the defendant admitted that he took documents from the United States Attorney's Office without permission and retained some of them for a significant period of time. Thus, he established, as a practical matter, his own guilt for the government."

Yes, Berkowitz did do this, but I believe it is more accurate that we point out that the strategy of his defense was that even though he admitted taking the documents, the jury should not consider this an act of theft because he lacked the requisite intent to permanently deprive the government of possession in that he believed some of the documents were his and he only wished to make copies of others. Berkowitz during his opening statement stated:

> "Now, there is a difference between stealing and taking. Some of those things—some of those documents were originally in my possession and, I maintain, belong to me. Some of those things perhaps I was entitled to. And some of those documents, which are originals, the government will try to show that I took from the U.S. Attorney's office. And that part is true; I did take them out of the U.S. Attorney's office. In order for an act like that, however, to be considered theft, the government must demonstrate that it was my intention to permanently deprive it of the use of those documents. In order for me to prove that it was not theft, I have to demonstrate to you that it was my intention not to deprive the government of their use but rather to make sure that they were used.... Why did I take them? Well, I took some of them because I wasn't able to copy them in the U.S. Attorney's office, and it is true that I made numerous copies of documents in the U.S. Attorney's office which the government would much rather I would not have copied or even known about."

It is clear that Berkowitz's trial strategy was to prove that he lacked the requisite intent to permanently deprive the government of the documents. Indeed, this was not a defense that Berkowitz pulled out of the air on the eve before his trial. At a December 22, 1988, hearing before the district court, almost two weeks before his opening statement, Berkowitz stated that "he intend[ed] to offer an extensive and comprehensive defense which goes to the heart of the issue which is the intent that is involved with these charges." This defense and his admission of taking the items from the government's possession was clearly a tactical decision as Berkowitz intended and explained. Berkowitz clearly knew what he was doing: he was caught taking documents from the government and he was not about to sit idly by while the prosecution piled up document after document he obviously purloined from their offices and files. His trial strategy, perhaps the only plausible one, was to personally try to convince the jury that he was just intent on making copies of the documents for his defense, that he had no intent to deprive the government of the documents, that he intended to return everything, that he believed the documents were his, etc. Unfortunately for Berkowitz, his theory of defense was not accepted by the jury. However, for the dissent to state that Berkowitz "established, as a practical matter, his own guilt for the government" as an explanation and/or justification for its holding that Berkowitz did not understand the proceedings is inaccurate (as fully explained above), as a defense of this nature was the only plausible one available to him.

In addition we must not forget that Berkowitz like the defendant in *Moya–Gomez* was not a first-time guest of the criminal justice system: he was convicted in 1970 of uttering a forged instrument. Furthermore, Berkowitz had on a previous occasion represented himself in a civil action in which he conducted pretrial discovery. Also, like the defendant in *Moya–Gomez*, Berkowitz had numerous contacts with the criminal justice system in connection with related offenses: he actively participated in the discovery process of the tax fraud case.

Unlike the defendant in *Moya–Gomez*, whom the dissent in this case found made a knowing and intelligent waiver of counsel despite the district court's failure to con-

duct an adequate inquiry on the issue, Berkowitz had the uninterrupted and undivided assistance of standby counsel present in the courtroom at all times and was able to conduct his defense quite capably (without the aid of an interpreter).[2] In fact, Berkowitz and his standby counsel drafted and signed numerous motions on Berkowitz's behalf, including post-trial motions for a judgment of acquittal and for a new trial. The defendant in *Moya–Gomez* neither received help nor advice during trial from an attorney. *Moya–Gomez* at 738. Also, the defendant in *Moya–Gomez* represented himself without standby counsel in a complex one-month drug conspiracy trial; in contrast, Berkowitz's trial with standby counsel lasted a mere five days. Moreover, unlike the defendant in *Moya–Gomez* who received *70 years imprisonment* for his offenses, Berkowitz was sentenced to only *63 months imprisonment*. If the dissent found the defendant's waiver in *Moya–Gomez* to be knowingly and intelligently made, certainly the record in this case makes for an even more compelling argument for a valid waiver of counsel.

Finally, this is not a case in which a defendant of average or below average intellect bit off more than he could chew. Berkowitz's decision to proceed *pro se* was made by an intelligent and well educated individual. Berkowitz graduated from the University of California at Berkeley and had completed two quarters of advanced studies toward his master's in business administration. In addition, he furthered his educational pursuits through his attendance at Ner Israel Rabbinical College, located in Baltimore, Maryland.

"[T]he trial judge bears the 'serious and weighty responsibility ... of determining whether there is an intelligent and competent waiver by the accused.'" *Moya–Gomez* at 735, quoting *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed.

1461 (1938). While the district court in our case did not conduct an inquiry as in-depth as it should have, the record as a whole demonstrates throughout trial that Berkowitz's waiver was both knowing and intelligent. Furthermore, the explicit finding made by the trial judge that Berkowitz was competent to represent himself should be given the same kind of deference that this court gave the trial judge in *Moya–Gomez:* "This explicit finding by the district court, which had the opportunity to assess by its sustained observation the demeanor of the participants, is entitled to our deference." *Moya–Gomez* at 739. I wish to emphasize that I do not believe that there are any particular buzz words that a trial judge need recite in order to ensure that a defendant makes a knowing and intelligent waiver of counsel. Instead, I agree with the majority opinion which states that "[t]he real question when a criminal defendant waives counsel is not the quality of the trial judge's inquiry; rather, it is whether the defendant knowingly and voluntarily waived his right to counsel."

I believe the record as a whole, as well as the "background, experience, and conduct" of Berkowitz, demonstrates that he made a knowing and intelligent waiver of his right to counsel. *Moya–Gomez,* at 733. Thus, I concur with the majority opinion in this aspect.

## II. Validity of Arrest

I respectfully dissent from that portion of the majority opinion that would remand the case to the district court for an evidentiary hearing to determine where the officers were positioned when the arrest was made.

I agree with the majority and note that "the fourth amendment protects people's legitimate expectations of privacy." How-

---

**2.** The defendant in *Moya–Gomez* argued on appeal that his decision to represent himself was not a voluntary one because of the district court's fee decision. This court stated that "[a] voluntary decision to waive counsel is not necessarily one that is entirely unconstrained." *Moya–Gomez* at 739. In finding that the defendant's decision was voluntary, the court noted

the fact that "[a] criminal defendant may be asked to choose between waiver and another course of action as long as the choice presented to him is not constitutionally offensive." *Id.* Unlike the defendant in *Moya–Gomez,* Berkowitz received exactly what he wanted—*pro se* representation along with a standby counsel.

ever, the fourth amendment should not be construed to provide protection to a defendant like Berkowitz, who upon opening the door of his home was immediately advised that he was under arrest and made no objection nor did he in any way resist or forestall the police officers' entry inside the doorway. In fact, he invited both officers into his home after being told that he would need an escort after the arrest when he requested an opportunity to enter into his house to get his wallet and keys.[3]

The Supreme Court in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), held that a warrantless arrest of an individual in a public place upon probable cause does not violate the fourth amendment. Shortly thereafter, the Supreme Court held that a warrantless arrest at the door of an individual's home, likewise, does not violate the fourth amendment because there is no protectable expectation of privacy in an open doorway. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). Even though the defendant in *Santana* was standing in the doorway of her home when the officers arrived, the Court stated that "[s]he was not in an area where she had an expectation of privacy." *Id.* at 42, 96 S.Ct. at 2409. The Supreme Court reasoned:

> "What a person knowingly exposes to the public, even in his own house or office, is not a subject of fourth amendment protection.... She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house.... Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in *Watson*."

*Santana* at 42, 96 S.Ct. at 2409 (citations omitted).

This court has upheld the validity of a doorstep arrest. *McKinney v. George*, 726 F.2d 1183, 1188 (7th Cir.1984). In *McKinney*, the defendant was arrested upon probable cause without a warrant when he opened his door in response to the officers' knock. The court noted that if the defendant had refused to surrender himself to the officers and the officers had gone inside the defendant's house and seized him, "we might have a different case." *McKinney* at 1188. Other courts that have ruled on the constitutionality of doorstep arrests have found no fourth amendment violation. *See United States v. Mason*, 661 F.2d 45 (5th Cir.1981); *United States v. Botero*, 589 F.2d 430 (9th Cir.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *United States v. McCool*, 526 F.Supp. 1206 (M.D.Tenn.1981); *People v. Morgan*, 113 Ill.App.3d 543, 69 Ill.Dec. 590, 447 N.E.2d 1025 (1983).

However, the majority opinion mistakenly applies the rationale of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), to the facts of this case instead of applying *Santana* and its progeny. The officers in *Payton* went to the defendant's house to arrest him, and in response to the officers' knock on the door, the defendant's young son opened the door, allowing the officers to see the defendant sitting in bed. The officers then entered into the defendant's house and arrested him, and the man's home was no longer his castle. The Supreme Court held that the arrest was unconstitutional because the fourth amendment prohibits entry into an individual's home to make an arrest without a warrant absent exigent circumstances. *Payton* at 590, 100 S.Ct. at 1382. Thus, *Payton* is not applicable to this case because the officers did not enter into Berkowitz's house to make the arrest. Rather, the arrest occurred outside the house in the doorway; and under *Santana* a doorway is considered a public place. Unlike the defendant in *Payton* (where the door was answered by a young child incapable of giving consent), Berkowitz himself answered the door. Furthermore, Berkowitz does not allege that the IRS agents misrepresented themselves or that they were guilty of using either force or deception to compel him to open the door and submit to the arrest. Instead, Berkowitz's action in

---

**3.** Berkowitz does not challenge the fact that the officers had probable cause to arrest him.

opening the door was completely voluntary. *See United States v. Morgan,* 743 F.2d 1158 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985), where a sheriff's use of spotlights and a bullhorn in compelling the defendant to appear at his mother's front door rendered the arrest invalid; *see also United States v. Johnson,* 626 F.2d 753 (9th Cir.1980), *aff'd* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), where agents' misrepresentations of their identities violated the defendant's fourth amendment right because the misrepresentations induced the defendant to open the door. Upon opening the door, Berkowitz was immediately advised he was under arrest. At this time, Berkowitz could have objected or refused to surrender himself and shut the door, thereby retaining his fourth amendment privacy interest and forcing the agents to secure a search warrant. However, he chose not to do so. Instead, Berkowitz's actions are tantamount to a voluntary arrest.

The majority's concern with whether the arrest proceeded the police officers' entry into the area immediately inside the doorway or whether the entry preceded the arrest needlessly obfuscates the fact that Berkowitz was arrested in his doorway, and under *Santana, a warrantless arrest at the doorway of an individual's home does not violate the fourth amendment.* Therefore, even if I were to believe Berkowitz's account of the incident, which I do not,[4] the arrest would still be a valid one under the fourth amendment. Accordingly, I respectfully dissent.

RIPPLE, Circuit Judge, dissenting.

I respectfully dissent from that portion of the panel majority opinion that excuses the failure of the district court to comply with the mandate of *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562

(1975), that a criminal defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)).

This issue turns on two irrefutable propositions:

1. The Supreme Court of the United States has held that it is the duty of the trial judge to ensure that a waiver of the right to counsel be a knowing and intelligent one. Emphasizing the mandate of *Faretta,* the Court has remarked recently:

> [W]e have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial.

*Patterson v. Illinois,* 487 U.S. 285, 298, 108 S.Ct. 2389, 2397, 101 L.Ed.2d 261 (1988).

2. As an intermediate appellate court in the federal system, it is our duty to apply that precedent in a straightforward, principled manner. Today, the panel majority evades this responsibility by suggesting two justifications. It is important to note that they are *alternate* justifications—proffered apparently in the hope that the reader will be seduced into accepting the whole as greater than the sum of its parts.

First, the majority suggests that we ought to ignore the *Faretta* argument as underdeveloped and therefore waived. It is true that we have employed this ground in the context of a direct criminal appeal. However, when a fundamental right is at stake, it ought to be invoked with great prudence and circumspection. Indeed, the Supreme Court's explicit mandate in *Faretta* ought to counsel particular care. The panel's "one sentence" characterization is,

---

**4.** I have serious doubts as to Berkowitz's credibility on this issue given that he has already admitted to stealing and destroying government evidence while fraud and mail fraud charges were pending against him. Moreover, Berkowitz's criminal history indicates a predisposition for being less than truthful (he was convicted in

1970 for uttering a forged instrument in Indiana). Finally, the district court at sentencing increased Berkowitz's offense level by two because it found that "Berkowitz impeded the administration of justice by committing perjury at his trial."

in my view, inaccurate. Such a characterization ignores the reality that the *Faretta* argument is made as part of a broader submission that the appellant was denied his right to counsel. Certainly, the appellant sufficiently oriented the court and the government to this contention. Indeed, the government extensively and candidly presented the matter to the court both in its briefs and at oral argument. When an error is as egregious as the one made by the trial judge, it does not take a book-length brief to point it out.

Second, apparently realizing that its waiver argument will be received skeptically by bench and bar, the panel majority suggests that the error, while egregious, is not reversible because the record, read as a whole, establishes a knowing and intelligent waiver. To support this suggestion, the panel majority distorts the precedent of this court and ignores important facts that are of record.

My brothers are quite correct in noting that, if a formal inquiry is deficient, we shall not reverse automatically. That principle was set forth and discussed extensively by the court in *United States v. Moya–Gomez*, 860 F.2d 706 (7th Cir.1988) (Ripple, J.). In that case, there was a formal inquiry, albeit a deficient one. *Id.* at 734. Moreover, there was *extensive* evidence that the defendant in that case fully understood the pitfalls of self-representation and the advantages of having counsel. *See id.* at 733–37. Indeed, the record made clear that the position taken by the defendant was a tactical one. *Id.* at 737.

By contrast, not only was there *no* formal inquiry here, but the district court affirmatively stated on the record that it knew little about the capacity of the defendant to proceed *pro se:*

> The Court: Fine, by all means. And I find, *based on the little I know about your background,* that if any pro se defendant is competent to represent himself, it is you, Mr. Berkowitz, and I have no problem with it at all, provided that,

as you request, Mr. Huyck stand by as standby counsel.

Tr. at 3 (emphasis supplied).

The ability of the defendant to handle his own representation, assessed with the benefit of hindsight from the record, is an appropriate factor for an appellate court to consider in assessing whether a waiver of counsel was knowing and intelligent. *See Moya–Gomez,* 860 F.2d at 736. Such information is at least somewhat relevant and probative with respect to the defendant's background and intelligence. We must not forget, however, that the fundamental issue is not whether the defendant was able to hold his head above water in the trial arena, but whether he understood the important right he was sacrificing. In any event, here, the defendant's actual performance at trial raises great questions about whether he appreciated the magnitude of the task he had taken on. During the course of his direct and cross-examination (assisted by standby counsel), the defendant admitted that he took documents from the United States Attorney's Office without permission and retained some of them for a significant period of time. Thus, he established, as a practical matter, his own guilt for the government.

The mandate of the Supreme Court is clear. The doctrines of stare decisis and precedent impose on us a duty to apply this mandate. While the cost of retrial is a great one from both a financial and social perspective, the cost imposed on the judicial system is even greater if we fail to require what the law requires of us. Accordingly, I respectfully dissent.[1]

---

1. Judge Coffey has filed a separate opinion that expresses disagreement with the views set forth here. The *ad hominem* argumentation in that opinion demonstrates, far better than anything more that could be written here, the deficiencies of his criticism.