**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John E. SANDLES, Defendant–Appellant.**

No. 93–1999.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 13, 1994.

Decided April 27, 1994.

Paul Kanter, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Annice Kelly (argued), Fox & Fox, Madison, WI, for defendant-appellant.

Before CUMMINGS, ESCHBACH, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

After a four-day trial, a jury convicted John E. Sandles ("Sandles") of five counts of bank robbery in violation of 18 U.S.C. § 2113(a). The district court sentenced Sandles to several concurrent terms of 180 months imprisonment and three years supervised release. On appeal, Sandles raises two issues: (1) whether he knowingly and intelligently waived his Sixth Amendment right to counsel; and (2) whether the district court abused its discretion in denying Sandles' motion for substitute counsel. We vacate the conviction on the former ground, and remand for a new trial. Therefore, we do not address the latter argument.

## I.

In a three-month period commencing on December 10, 1991, John Eric Sandles committed a spree of bank robberies that netted him approximately $13,500. Following the last of the five robberies, a criminal complaint was issued and eventually Sandles was arrested. On May 21, 1992, Sandles made his first court appearance in connection with this case, at which time the court found Sandles to be indigent and appointed David E. Lowe ("Lowe") to serve as counsel. On July 7, 1992, the grand jury returned a Superseding Indictment charging Sandles with five counts of bank robbery in violation of 18 U.S.C. § 2113(a). Following his arraignment, Sandles filed a notice of insanity defense pursuant to Fed.R.Crim.P. 12.2. At the government's request, the court issued an order on July 23, 1992, directing that Sandles undergo psychiatric and psychological examinations. On October 13, 1992, the examination report was submitted to the court revealing that Sandles suffered from grandiose delusions about his own capabilities. About a month after the report was submitted, the court granted Sandles' motion for an independent evaluation, scheduled a pretrial conference for January 22, 1993, and set trial for February 1, 1993.

On December 30, 1992, Sandles filed a *pro se* motion to dismiss and discharge Lowe as his court-appointed attorney. Sandles leveled a number of rather serious accusations, including the allegations that Lowe had: (1) "demonstrated racial bias and hostilities;" (2) advised Sandles not to cooperate with the court-appointed psychologist and to deny any memory of the crimes; (3) refused to consult with Sandles' mother to obtain relevant medical records; and (4) refused to file pretrial motions to obtain said records. Sandles argued that his right to a fair and impartial

trial would be compromised if Lowe continued his representation. On January 4, 1993, Lowe filed a motion to withdraw as counsel, supported by an affidavit averring that the breakdown in the attorney-client relationship warranted appointment of substitute counsel.[1]

At the January 22, 1993, pretrial conference, the court heard oral statements from both Sandles and Lowe concerning the motions for new counsel. The following testimony was presented:

MR. LOWE: Your honor, I have filed two motions with the court and I know Mr.—my client has filed a motion with the court. One motion is a motion for continuance of the trial date in order to attempt to obtain some medical records for Mr. Sandles' evaluation. The other and probably more germane at this point is a motion on my behalf to withdraw, and that was filed shortly after Mr. Sandles informed me that he had filed a motion requesting new counsel.

THE COURT: All right, thank you. Mr. Sandles, you have two options at this point. You can either represent yourself or continue with Mr. Lowe's representation. I'm only willing to grant Mr. Lowe's and your motion for new counsel if you want to proceed without a lawyer. I would advise you against doing so because there are many matters from the jury instructions to legal matters that need to be addressed in the context of litigation, but I do not at all look kindly on motions for new lawyers on the eve of trial.

Before entertaining Sandles' response, the court permitted Lowe to answer the charges raised by Sandles' motion. In addition to categorically denying the allegations that he

---

1. Lowe's affidavit stated in relevant part:

8. Throughout the entire attorney-client relationship to date, there has been a constant conflict between counsel and the defendant on how to best proceed with this case.

9. On December 31, 1992 the defendant informed me, during a telephone call, that he had prepared and mailed to the court for filing a Motion requesting new counsel. Mr. Sandles, at an earlier court appearance, had indicated that he wanted a new attorney.

10. I believe that at this point it would be in Mr. Sandles best interest to obtain new counsel. Mr. Sandles is of the opinion that I do not have his best interests in mind, in dealing with this case.

11. I regret to state that at this point there is such a breakdown in our relationship that new counsel would be warranted.

had neglected his client and exhibited racial bias, Lowe made the following statement:

MR. LOWE: I've been—I think it's past the point where he's attacking me or making comments on my professional conduct. It's now personal.

I have represented in this district for at least ten years many, many defendants, and I've practiced before this court. And appointments, most of them because of the district we're in, I suppose, are made up of minority individuals. I have represented them to the point quite honestly, Judge, where my family and I economically have been disadvantaged because of the fees and I accept that. It's because it's something I have wanted to do. And to be accused of being racially biased and making racial comments I find reprehensible. I deny them.

. . . . . .

In sum, Judge, I think the only thing that I do agree with in Mr. Sandles' motion is that at this point because of the personal nature of the way this has come out, I don't believe it's in his best interests for me to continue to represent him. I do not believe because of the personal nature of this that I can zealously represent him and follow the ethics guidelines that I would be bound to follow should I be his attorney. It's for those reasons, Judge, that I'm requesting to be relieved from any further representation of Mr. Sandles.

Sandles then responded to Lowe's statement and simply reiterated much of what he had alleged in his motion. The following discussion then ensued:

THE COURT: All right, thank you. Well, you hit the nail on the head, Mr. Sandles; that is, all of this in the court's view is nothing short of pure pettiness—

MR. SANDLES: Yes, sir.

THE COURT: —in an attempt to manipulate the court. I reject it out of hand. The case is going to trial on Monday, February 1st. Mr. Lowe will either be your attorney or stand-by counsel. I am not appointing any new counsel to represent you in the matter; and I would expect that you cooperate with Mr. Lowe in the

next week or ten days because we're going to trial in this case on Monday, February the 1st at eight-thirty in the morning.

MR. SANDLES: Okay. Sir, there's one last—

THE COURT: And if there is any request for jury instructions or voir dire, they should be filed with the court not later than the close of business on Friday, that is, Friday January 29th. And we will be in this courtroom so all of your subpoenas should be returnable at courtroom 225.

MR. SANDLES: Yes, sir. There's one last thing, sir.

MR. LOWE: Judge, I would like a response to your question to him whether he wants to do this by himself or with me.

MR. SANDLES: It appears that I don't understand the philosophies of logic well enough to defend myself. I'm not equipped to understand how to defend an argument or to bring out a fallacy or anything like that. I don't know any of that. I know it but I'm not prepared to do that on any since I haven't—I have nothing, I know nothing of that. I know of it but I'm not—he's practiced. He has the techniques much better, so it would be much better for me to have him as an attorney. . . .

After Sandles informed the court that he wished to have Lowe as his attorney rather than go *pro se*, a conversation took place concerning Sandles' ability to obtain certain medical records prior to trial. The conversation degenerated into the following exchange:

THE COURT: Well, that's something you'll have to work out between the doctor and your attorney. I'm sorry.

MR. SANDLES: Sir, I'm saying that he—(to Mr. Lowe) You promised me that you would talk to him about—

MR. LOWE: I called and made your request.

MR. SANDLES: To the doctor? To the judge?

MR. LOWE: Judge, this is the kind of manipulation and I don't—

MR. SANDLES: Manipulation.

MR. LOWE: Judge, I don't mean to be disrespectful, I certainly don't, but this is

the kind of manipulation that I've been going around with this client ever since I've been appointed to represent him. Now, if you are ordering me to continue my representation, I will do so to the best of my ability.

THE COURT: All right, I would suggest—

MR. LOWE: So this court understands, and I'm sorry to put in on the record because I don't know where this case is going to end up or how it's going to end up, I also have to be quite frank, malpractice insurance I need to consider and certainly—

MR. SANDLES: Consider it.

MR. LOWE: That's the kind of comment.

MR. SANDLES: Sincerely. There's nothing wrong with that.

MR. LOWE: Having to go to trial with Mr. Sandles based on the manipulation and his attitude, I'm almost being put in a position of having to take the case to trial where I said I'm going to be ineffective and now I have—

MR. SANDLES: You literally have been ineffective already.

THE COURT: I'm sorry, we're going to trial on February 1st. I suggest you meet with your client after this hearing this morning, get out all the subpoenas you want. We'll try this case if it takes six months to try it. We're starting next Monday, February 1st.

Thus, when court recessed, Lowe remained Sandles' trial counsel. On January 26, however, Lowe submitted a motion to reconsider his request to withdraw, citing Sandles' belief that Lowe was both ineffective and racist. Again, Lowe stated the belief that his continued representation of Sandles would be against Sandles' best interest and possibly would deny Sandles' right to counsel. The court denied Lowe's motion without a hearing. The following day, January 27, Sandles filed a notice of intent to proceed *pro se* with Lowe as stand-by counsel.[2]

The case proceeded to trial as scheduled on February 1, 1993. Sandles conducted voir dire, gave an opening statement, and cross-examined six government witnesses. In his opening statement, Sandles admitted his criminal behavior but raised the affirmative defense that he suffered from mental disease at the time of the robberies.

When the trial resumed the following day, Sandles stated in open court his intention to gain reinstatement of Lowe as his attorney. As a result of this statement, Lowe made a motion for a mistrial at a sidebar conference. The court denied Lowe's motion, but formally acknowledged that Lowe was taking over Sandles' representation. Thereafter, Lowe acted as trial counsel, cross-examining government witnesses, examining Sandles' eleven witnesses, including an insanity expert, cross-examining the government's rebuttal witness on the insanity issue, and delivering Sandles' closing argument. Unfortunately, the attorney-client relationship fared little better with Lowe as lead counsel. On the second day of trial, outside the presence of the jury, Sandles accused Lowe of "railroading" him and asked whether he could resume representing himself. The court denied Sandles' request. The next day the tension between Lowe and Sandles again manifested itself during Lowe's direct examination of Sandles' brother and of Sandles himself.

After a four-day trial, on February 4, 1993, the jury returned guilty verdicts on all five counts. On April 21, 1993, the court sentenced Sandles to several concurrent terms of 180 months and entered judgment on the same day. Sandles raises two issues on appeal: (1) whether he entered into a knowing and intelligent waiver of his Sixth Amendment right to counsel; and (2) whether the district court abused its discretion in denying Sandles' motions for substitute counsel.

## II.

Because of the importance of the right to counsel in our constitutional scheme,

---

**2.** "The appointment of standby counsel is a well-recognized safeguard when a defendant elects to proceed *pro se* and one that should be employed on a regular basis." *United States v. Moya–* *Gomez,* 860 F.2d 706, 740 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989).

we do not lightly conclude that a defendant has waived his right to counsel. *United States v. Belanger*, 936 F.2d 916, 919 (7th Cir.1991). Accordingly, we will "indulg[e] every reasonable presumption against the waiver." *Id.* (citing *Wilks v. Israel*, 627 F.2d 32, 35 (7th Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981)). Nevertheless, the right to counsel is not without limits, *Robinson v. United States*, 897 F.2d 903, 908 (7th Cir.1990), and an apparent waiver will be upheld where it was knowing and intelligent.

When an accused manages his own defense, "he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right of counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464–465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)); *Robinson*, 897 F.2d at 906. The defendant therefore should be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 241–242, 87 L.Ed. 268 (1942)); *Belanger*, 936 F.2d at 918.

Both the Supreme Court and this court have discussed extensively the obligation of a trial court to ensure that a defendant who chooses to waive his right to counsel does so knowingly and voluntarily. The High Court, "recognizing the enormous importance and role that an attorney plays at the criminal stage," has "imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him [to] waive his right to counsel at trial." *Patterson v. Illinois*, 487 U.S. 285, 298, 108 S.Ct. 2389, 2398, 101 L.Ed.2d 261 (1987). While the trial judge need not give "a hypothetical lecture on criminal law," *United States v. Mitchell*, 788 F.2d 1232, 1235 (7th Cir.1986), "[t]he judicial inquiry

and educative effort concerning the importance of legal representation that must necessarily precede any knowing and intelligent waiver of counsel cannot be cursory or by-the-way in nature." *Belanger*, 936 F.2d at 918 (citing *United States v. Moya–Gomez*, 860 F.2d 706, 733 (7th Cir.1988)). Time and again this court has stressed the need for a thorough and formal inquiry in which the court "asks the necessary questions and imparts the necessary information." *Belanger*, 936 F.2d at 918; *see also United States v. Clark*, 943 F.2d 775, 780 (7th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993); *United States v. Bell*, 901 F.2d 574, 577 (7th Cir.1990). In particular,

> [W]e have strongly suggested that a trial court, at a minimum, inquire of the defendant's age and level of education, and inform him of the crimes with which he was charged, the nature of those charges, and the possible sentences they carry. Further, a defendant should be made aware of the "difficulties he would encounter in acting as his own counsel."

*Belanger*, 936 F.2d at 918–919 (citations omitted).

Today we reiterate the importance of a thorough and formal inquiry, though we again stop short of ruling that a scanty inquiry, by itself, automatically establishes constitutional error. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). Instead, we look to see whether "the record as a whole demonstrates that the defendant knowingly and intentionally waived his right to counsel." *Clark*, 943 F.2d at 780; *Bell*, 901 F.2d at 577. In making this determination, we consider four relevant factors: (1) whether and to what extent the district judge conducted a formal inquiry; (2) other evidence in the record that establishes whether the defendant in fact understood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to proceed *pro se*. *Moya–Gomez*, 860 F.2d at 733; *see also Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023 ("The determination of whether there has

been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").

### A.

As this court previously has noted, a defendant who raises the possibility of representing himself at trial places the district court between the Scylla of trammeling the defendant's constitutional right to present his own defense, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and the Charybdis of shirking its "constitutional duty to ensure that the defendant only represents himself with full awareness that the exercise of that right is fraught with dangers." *Moya–Gomez*, 860 F.2d at 732; *see also Patterson*, 487 U.S. at 298, 108 S.Ct. at 2397–2398. No matter what decision the district court ultimately makes—whether to honor or deny the request—the defendant is likely to appeal. *Moya–Gomez*, 860 F.2d at 732. Moreover, the challenge of navigating such an inherently difficult course can only be enhanced when, as in this case, the defendant has accused appointed counsel of racial bias, counsel has termed the defendant "manipulative," and the court has concluded that the entire attorney-client dispute "is nothing short of pure pettiness."

 Because of these complexities, we have advised district courts to insulate themselves from attack on appeal by conducting, as a matter of course, "a formal inquiry in which the defendant is informed fully of the risks of proceeding *pro se* and explicitly advised against self-representation." *Id.* at 733. While the record here indicates that the district judge advised Sandles against proceeding *pro se*, it also demonstrates that the exchange between the judge and Sandles failed to adequately warn Sandles of the dangers and disadvantages of self-representation. At the January 22 pretrial confer-

ence, the district judge indicated that he would not grant Sandles' motion for substitute counsel and presented Sandles with the option of representing himself or continuing with Lowe as his lawyer. The court simply stated, "I would advise you against [proceeding without a lawyer] because there are many matters from the jury instructions to legal matters that need to be addressed in the context of litigation...." The record indicates no additional, more elaborative exchanges between Sandles and the district judge regarding the potential pitfalls of self-representation. Sandles filed a notice of intent to proceed *pro se* on January 27, six days before trial. When trial commenced on February 1, Sandles conducted voir dire, gave an opening statement, and cross-examined six government witnesses. At no time in this sequence did the court ascertain whether Sandles truly understood the gravity of his undertaking. The fact that Sandles intended to present an insanity defense further highlighted the duty of the court to ascertain *before trial* whether Sandles understood the difficulty of establishing such a defense.[3] The results of Sandles' psychological evaluation, indicating that he suffered from grandiose delusions about his own capabilities, also at least hinted at the need for the trial court to engage in some level of "reality testing" to determine if Sandles was indeed up to the task of representing himself. The court did, of course, appoint Lowe as standby counsel, and specifically directed Sandles to address his specific requests for an explanation of voir dire and sequestration to Lowe. While the court acted appropriately in both circumstances, even the capable assistance of standby counsel during trial cannot function as a substitute for a detailed inquiry into a defendant's decision to waive his constitutional right to counsel.

Though we have emphasized the duty of the *district court* to engage the defendant in a dialogue that underscores the extreme dif-

---

3. On the second day of trial, when Sandles asked the court to allow Lowe to take over as primary counsel, the trial court expressed during a sidebar conference the type of concern over Sandles' defense strategy that would have been appropriate as part of a pre-trial waiver inquiry: "I think you need to realize and seriously consider where

it is that you are going with all of this, particularly against the backdrop of what the court, based on the medical report, finds to be something less than clear and convincing evidence of a mental disease that would excuse you from criminal culpability here." Tr. at 187.

ficulty'of self-representation, *see Moya–Gomez*, 860 F.2d at 735, we have on occasion considered evidence that *someone* conducted an inquiry as weighing in favor of finding a knowing and intelligent waiver. *See id.* (opining that the government attorneys' attempt to warn defendant of the dangers of self-representation weighed in favor of waiver); *Wilks*, 627 F.2d at 35 (finding a waiver of counsel where the assistant district attorney extensively questioned the defendant, pointing out the places in a trial where assistance of counsel would be particularly useful and where the court on more than one occasion urged petitioner to accept the services of his attorney and specifically suggested that the defendant consult with standby counsel at key points of the trial). As an officer of the court, it would have been perfectly appropriate for the Assistant United States Attorney ("AUSA") prosecuting the case to assist the trial judge by calling to his attention the possible inadequacy of the waiver inquiry made of Sandles. *See Bell*, 901 F.2d at 578. Unfortunately, the record here fails to indicate that the AUSA either raised the issue with the judge or attempted to conduct his own inquiry.[4]

In sum, we find that very limited scope of the district court's inquiry into Sandles decision to waive his right to counsel weighs rather heavily against finding a knowing waiver in this case.

### B.

We next consider whether other evidence in the record establishes that, despite the inadequacy of the district court's waiver inquiry, Sandles in fact understood the dangers and disadvantages of self-representation. In prior cases we have noted some factors that indicate the requisite knowledge. For example, in *Moya–Gomez* we found that the defendant's frequent admissions of "legal disability" stemming from his proceeding without counsel, coupled with former counsel's representation to the district court that he had tried to explain to the defendant some of the pitfalls of self-representation, "weighed

heavily on the side of finding a waiver." 860 F.2d at 736. Later, in *Bell*, we held that the defendant's recognition that he would be at a "disadvantage" in representing himself and his obvious reliance on standby counsel during trial weighed in favor of finding a knowing waiver. 901 F.2d at 578.

In this case, nothing in the record shows that Lowe impressed upon Sandles the difficulty of proceeding *pro se*. Clearly Sandles did perceive that self-representation entails some detriment. At the pretrial conference, Sandles stated that he did not "understand the philosophies of logic" well enough to defend himself and that "it would be much better" for him to have Lowe as his attorney. Final Pretrial Conference Tr. at 9. At trial, after deciding to proceed with Lowe as standby counsel, Sandles emphasized to the jury in his opening statement that he was not an attorney and entreated them to "bear with" him as he presented his case. Trial Tr. at 85–95. Finally, on the second day of trial when he sought to re-enlist Lowe as primary counsel, Sandles again called attention to his lack of qualifications and skills as an advocate. Trial Tr. at 181–183. In addition, the record also indicates that Sandles relied on Lowe for assistance in preparing questions for voir dire, and, of course, turned over his entire defense to Lowe on the second day of trial. Thus, as in *Bell*, Sandles' recognition of the importance of counsel and his consultation with and reliance on standby counsel weigh somewhat in favor of finding a knowing waiver.

### C.

A third factor to consider in determining whether the defendant waived the right to counsel is the background and experience of the defendant. In this context, "background and experience" includes educational achievements, prior experience with the legal system (including prior *pro se* representation), and performance at trial in the case at bar. *See Clark*, 943 F.2d at 781;

---

4. At oral argument in this court, the AUSA (who also was trial counsel) candidly expressed his

regret that he had not done so.

*Bell,* 901 F.2d at 578–579; *Moya–Gomez,* 860 F.2d at 736.

Here the district court did not specifically question Sandles on the record about his education or his prior experience, if any, as a criminal defendant or *pro se* litigant. On the basis of Sandles' appellate brief, the appendix filed therewith, and the representations of counsel at oral argument, we have ascertained that Sandles never graduated from high school, and, although he briefly attended college, he was placed on academic probation for failing grades and never received any college credits. While Sandles was no stranger to the criminal justice system, we have been presented with no evidence that he had represented himself in court prior to this case. Finally, unlike in *Bell,* 901 F.2d at 578 n. 4 or *Clark,* 943 F.2d at 781, the district court neither commended nor remarked favorably on Sandles' performance at trial, nor can we. In his opening statement, Sandles admitted his guilt, Tr. at 86—a questionable strategy, at best, in light of the deficiencies in his insanity defense that, as we noted above, *ante* at 1127 n. 3, the district court itself specifically called to his attention on the second day of trial. Tr. at 187. In sum, we find that Sandles' background and experience, taken as a whole, weigh against finding a knowing and intelligent waiver.

## D.

Finally, we consider the context of Sandles' decision to proceed *pro se.* We have indicated that waiver will more likely be found where a defendant's decision to represent himself appears tactical or strategic in nature. *See Bell,* 901 F.2d at 579 (finding that defendant's tactical decision to proceed *pro se* as a result of his attorney's unwillingness to present an alibi defense supports the finding of a knowing waiver); *Moya–Gomez,* 860 F.2d at 737 (finding that defendant's tactical decision to proceed *pro se* in response to the district court's resolution of an attorneys' fees question supports the finding of a waiver). We also have noted that evidence of manipulation or intentional delay on the part of the defendant militates in favor of a knowing and intelligent waiver. *Moya–Gomez,* 860 F.2d at 737 (citing *Fitzpatrick v.*

*Wainwright,* 800 F.2d 1057, 1067 (11th Cir. 1986) ("Evidence of manipulation or intentional delay implies a greater understanding of the proceedings and an understanding of the risks and complexities of a criminal trial.") and *McQueen v. Blackburn,* 755 F.2d 1174, 1178 (5th Cir.) (where the defendant was "cautioned that no replacement counsel would be appointed," his insistence on the third day of trial that his present counsel be removed from his defense "was the functional equivalent of a knowing and intelligent waiver of counsel"), *cert. denied,* 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985)); *see also United States v. Fazzini,* 871 F.2d 635, 642 (7th Cir.) (finding waiver by conduct where the defendant refused to cooperate with numerous appointed counsel and was warned of the consequences that his failure to cooperate would have), *cert. denied,* 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989).

In this case, the district court did accuse Sandles of attempting to manipulate the court. Final Pretrial Conference Tr. at 8. In view of the fact that the district court actually oversaw the underlying litigation and had the opportunity to observe the parties, we will not quarrel with its characterization of the proceedings in the absence of persuasive evidence to the contrary. Thus, we will not disregard the district court's judgment that Sandles' motion for substitute counsel was an attempt to manipulate the court. Nevertheless, we believe it significant that this charge was made in the context of the court's denying Sandles' motion for substitute counsel ten days before trial. In so doing, the court explicitly left Sandles with a choice between self-representation and continued representation by Lowe. Thus, as of the time of the "manipulation," it was clear even to the district court that Sandles had not waived his right to counsel. Further, nothing in the record indicates that the district court viewed Sandles' actual decision to represent himself, as indicated by the filing of his notice of intent six days before trial, as tactical, strategic, or manipulative. Nor do we. Accordingly, we find that the context of Sandles' decision to proceed *pro se* neither weighs in favor of nor against a finding of a knowing and voluntary waiver.

Though our precedents tell us what factors to consider, we find little guidance as to the weight to be given each factor in determining whether "the record as a whole demonstrates that the defendant knowingly and intentionally waived his right to counsel." *Clark,* 943 F.2d at 780. In both *Bell* and *Moya–Gomez,* the court concluded that the respective defendants had properly waived their right to counsel after finding that the first factor militated against waiver while the other three factors supported waiver.[5] Here we have concluded that only the second factor weighs in favor of finding a waiver while the fourth factor is neutral in our calculus. We doubt strongly that a subject such as waiver analysis is susceptible to any kind of a mathematical formula yielding a precise result, and, if such a formula might exist, we concede our inability to generate it. Nevertheless, given this set of circumstances and bearing in mind the Supreme Court's directive to "indulg[e] every reasonable presumption against the waiver," *Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023, we hold that Sandles did not knowingly and voluntarily waive his Sixth Amendment right to counsel.

### III.

We conclude that the record as a whole demonstrates that Sandles did not knowingly and intelligently waive his Sixth Amendment right to counsel. In so doing, we are mindful of the government's contention that the evidence against Sandles was overwhelming and the reality that "the cost of retrial is a great one from both a financial and social perspective." *Berkowitz,* 927 F.2d at 1400 (Ripple, J., dissenting). Nevertheless, because we believe "the cost imposed on the judicial system is even greater if we fail to require what the law requires of us," *id.,* we vacate the judgment of the district court entered pursuant to the jury verdict and remand for a new trial.

VACATED AND REMANDED.

---

**5.** In *Bell,* the court adjudged the case "a close one due to the inadequacy of the magistrate's warnings," but found that the record as a whole indicated a knowing and intelligent waiver. 901 F.2d at 579.