In the

# United States Court of Appeals

### For the Seventh Circuit

No. 05-3070

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DONVILLE JAMES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 278—-**Wayne R. Andersen,** *Judge*.

ARGUED OCTOBER 16, 2006—DECIDED JUNE 4, 2007

Before POSNER, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Donville James was convicted of attempting to possess with intent to distribute more than five kilograms of cocaine, *see* 21 U.S.C. §§ 841(a) and 846, carrying a firearm during and in relation to and in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c), and counterfeiting obligations of the United States, *see* 18 U.S.C. § 472. Mr. James was sentenced to 211 months' imprisonment. He now challenges both his conviction and sentence. For the reasons set forth in this opinion, we affirm the judgment of the district court.

**I**

**BACKGROUND**

In November 2001, Allan Dubon approached the Federal Bureau of Investigation ("FBI") about becoming a paid informant. The FBI agreed to hire him, and, within a couple of weeks, Dubon provided the FBI with information linking Mr. James to counterfeiting and drug trafficking activities. Dubon told the FBI that he had engaged in drug transactions with Mr. James in the past. Dubon further claimed that one of these transactions had created trouble for him with the Mexican Mafia, his supplier, because Mr. James had paid Dubon in counterfeit currency.

FBI Agent Frank DePodesta instructed Dubon to remain in contact with Mr. James. In March 2002, working with Agent DePodesta, Dubon arranged a transaction involving fifteen kilograms of cocaine. The details of the proposed transaction were recorded during a phone call between Mr. James and Dubon. Mr. James planned to pay for the cocaine with $300,000 in counterfeit currency, but he was able to procure less than $100,000. To deal with this "shortfall," Mr. James added cut-up paper to the bag containing the counterfeit money to make it appear to contain the full $300,000.

On the day of the exchange, the FBI and Secret Service monitored the transaction visually and through a sound transmitter worn by Dubon. The transmitting device also had recording capabilities, but, for an unknown reason, the recording function did not operate during the exchange. The FBI provided Dubon with five kilograms of simulated cocaine for this exchange. Mr. James and Dubon met in a McDonald's restaurant parking lot. Mr. James drove Dubon to another nearby parking lot to show Dubon the

counterfeit currency, which was in a second car driven by Mr. James' girlfriend. Mr. James then returned with Dubon to the McDonald's parking lot where they had met originally. Dubon then left Mr. James to retrieve the simulated cocaine. After receiving the simulated cocaine from Dubon, Mr. James was surrounded by FBI and Secret Service agents. He briefly attempted to flee, but was arrested at the scene. The authorities later found a loaded handgun in his vehicle. At about the same time, officers arrested Mr. James' girlfriend. The officers discovered a black backpack containing counterfeit currency in the trunk of her car.

After his arrest, Mr. James made a voluntary statement, inculpating himself in the transaction and including the amount of drugs involved. Nevertheless, Mr. James did not plead guilty, and the case went to trial. The centerpiece of Mr. James' trial strategy was to undermine the credibility of the Government's case by painting its informant, Dubon, as an unreliable criminal who was attempting to extricate himself from his own legal troubles by setting up Mr. James. Mr. James' attorneys suggested that, as a part of this strategy, Dubon intentionally turned off the recording device that he had worn during the encounter with Mr. James. To that end, Mr. James sought to inspect the device. The Government, citing national security concerns, resisted disclosure of the recording device. Eventually, however, it agreed to a stipulation, drafted by Mr. James' attorneys, that the device was working on the day of the arrest and that Dubon could have turned it off. The stipulation also stated that the Government had refused to disclose the device under a claim of privilege and that the claim of privilege had been upheld by the district court.

In keeping with this trial strategy, Mr. James' attorneys also sought to cross-examine the federal agents involved

in the investigation about Dubon's criminal history. Mr. James' attorneys wanted to use this testimony to draw into question Dubon's credibility. The Government objected on the ground that any testimony by the Government's witnesses regarding statements by Dubon would be hearsay. The Government further submitted that, if Mr. James was permitted to question the federal agents regarding Dubon's criminal history, the Government should be permitted to elicit from Agent DePodesta, on direct examination, testimony that Dubon had informed him of prior drug transactions with Mr. James in order to give context to Agent DePodesta's decision to work with Dubon and to repair Dubon's credibility. Although the district court had denied an earlier motion to allow the evidence relating to Dubon's past transactions with Mr. James, it agreed to allow this testimony if the defense "opened the door" by questioning the Government agents regarding Dubon's credibility. Mr. James' attorneys agreed to this arrangement and indicated that they would open the door on cross-examination. The Government then proceeded to question Agent DePodesta on Dubon's criminal history and on past drug transactions between Mr. James and Dubon. Mr. James then cross-examined Agent DePodesta on Dubon's criminal history.

Before the Government elicited testimony from Agent DePodesta regarding Dubon's past transactions with Mr. James, the district court interrupted the Government's examination to issue a limiting instruction to the jury. The court instructed the jury that any testimony from Agent DePodesta regarding statements from Dubon could be considered only to evaluate Dubon's credibility as an informant and to provide context for the Government's relationship with Dubon. The court instructed the jury

that any such testimony could not be considered to prove that Mr. James committed the uncharged offenses. Mr. James did not object either to the testimony or to the instruction.

Prior to closing arguments, the Government proposed a limiting instruction regarding testimony related to prior crimes. The instruction would limit the jury's consideration of this testimony to "the question of intent, knowledge, and absence of mistake or accident." R.67 at 13. The district court excluded this instruction at Mr. James' request, noting that the Government had not attempted "to prove up any other criminal conduct." R.113-3 at 519. However, the court left open the possibility of revisiting the instruction following closing arguments, in the event that anything that came up in the course of closing arguments caused Mr. James to change his mind with respect to the instruction. In the course of the Government's final closing argument, the prosecuting attorney made brief references to Mr. James' prior drug activity, but Mr. James did not object and did not request the court to revisit the limiting instruction.

Mr. James was convicted on all counts. The court then proceeded to sentencing. In a series of hearings, Mr. James presented a number of motions drafted without the assistance of counsel and requested to represent himself pro se. The district court never granted this motion; instead, it encouraged Mr. James to work out an agreement with his attorney that would allow Mr. James to present his concerns and to take a more active role in his case. Mr. James did so: His attorney presented legal arguments, and Mr. James followed with his own arguments, which supplemented, without prejudice, those of his attorney.

Mr. James was sentenced to 211 months' imprisonment. This sentence comprised 151 months for the cocaine and counterfeiting convictions and 60 months for possession of a firearm in connection with a drug trafficking crime. The latter component was required by statute to be served consecutively to his other sentence. The 151 months for the drug crimes was the bottom of the range prescribed by the advisory Guidelines.

Mr. James now appeals his conviction and sentence on several grounds. He submits that the district court erred when it allowed testimony by Agent DePodesta regarding past drug transactions between Mr. James and Dubon because such statements were testimonial hearsay and inadmissible under both the Federal Rules of Evidence and the Sixth Amendment's Confrontation Clause. Mr. James further submits that these statements were inadmissible under Federal Rule of Evidence 404(b) as evidence of prior bad acts because they were offered to show conduct in conformity with such acts. Mr. James also submits that the district court's failure to compel the Government to produce the non-functioning recording device worn by Dubon on the day of the transaction violated Federal Rule of Criminal Procedure 16(a)(1).

Mr. James also seeks review of his sentence. He contends that the district court failed to ensure that his waiver of counsel during the sentencing proceedings was knowing and voluntary. He further contends that the district court improperly calculated the appropriate sentencing range under the Guidelines by basing its Guidelines calculations on a quantity of drugs that was not found by a jury beyond a reasonable doubt and by failing to reduce the quantity of cocaine involved under the sentencing entrapment provisions of the Guidelines. Mr. James also

challenges the reasonableness of his sentence; he submits that the district court failed to account properly for the factors listed in 18 U.S.C. § 3553(a) when arriving at his sentence.

## II

## DISCUSSION

### A.  Prior Acts Testimony

We first address Mr. James' objections to evidence that implicated his involvement in prior drug transactions. As we already have noted, he submits that testimony by Agent DePodesta concerning prior transactions between Mr. James and Dubon was inadmissible hearsay. He further contends that, because he had no opportunity to cross-examine Dubon regarding the past transactions to which Agent DePodesta testified, he was denied his Sixth Amendment right to confrontation. He also submits that the evidence was inadmissible under Rule 404(b) of the Federal Rules of Evidence because it constituted evidence of prior acts offered to prove conduct in conformity with those acts. Mr. James bases these arguments on statements by Agent DePodesta that the Government elicited on direct examination and on statements made during the Government's closing arguments.

#### 1.  Agent DePodesta's Testimony

Mr. James' defense theory was that he was an innocent person who had been set up by Dubon, a career criminal looking to save himself from prison and from other drug dealers to whom he was indebted. Mr. James' attorney pursued this theory in her opening statement and on cross-

examination of the Government's first witness, Agent Daniel Dick of the United States Secret Service, by questioning Agent Dick about Dubon's background. Anticipating a similar cross-examination of Agent DePodesta, the Government sought permission to question Agent DePodesta on Dubon's background as a cooperating informant and on Dubon's experience with Mr. James in order to provide context to the investigation and to explain why the Government had chosen to work with Dubon. The Government proffered that Agent DePodesta would testify about what Dubon had told him about prior drug deals with Mr. James.

As we have noted earlier, prior to trial, the district court had ruled that the Government could not offer such testimony unless the defendant had opened the door to the prior acts. At trial, Mr. James did not object to the Government's eliciting testimony from Agent DePodesta on direct examination regarding Mr. James' prior drug deals with Dubon in anticipation of questioning by Mr. James' attorneys on cross-examination regarding Dubon's background. Indeed, Mr. James' attorneys stated explicitly that they were prepared to open the door to this testimony because of their anticipated cross-examination.

There was no error in the district court's decision to admit Agent DePodesta's testimony regarding Mr. James' prior dealings with Dubon. Before the Government elicited the testimony, the district court had issued a limiting instruction cautioning that any testimony regarding prior dealings between Mr. James and Dubon could be considered by the jurors only for purposes of providing context for the Government's decision to work with Dubon and, if it should become an issue, Dubon's credibility. The district court specifically stated that such testimony could

not be considered to determine whether Mr. James committed the uncharged offenses. "We presume that jurors follow instructions given them" unless "there is an overwhelming probability that the jury was unable to follow the instruction as given." *United States v. Eberhart*, 434 F.3d 935, 939 (7th Cir. 2006). The defendant bears the burden of establishing this overwhelming probability. *Id.*

The testimony elicited from Agent DePodesta tracks the limitations imposed by the district court. Before questioning Agent DePodesta regarding what Dubon had told him about Mr. James, the Government questioned him about the events on the day on which Mr. James was arrested. The Government then questioned Agent DePodesta as to how he had come to work with Dubon and Dubon's work with other officers on other cases. The Government then asked Agent DePodesta a total of three questions related to Dubon's prior dealings with Mr. James, all of which led to a line of questioning regarding the steps taken to assess the reliability of the information received from Dubon. Mr. James did not object to this testimony or to the limiting instruction.

An out of court statement is hearsay when it is offered to "prove the truth of the matter asserted." Fed. R. Evid. 801(c). We have held that statements offered to provide context for other admissible statements are not themselves hearsay because they are not offered to prove the truth of the matter asserted. *See United States v. Van Sach*, 458 F.3d 694, 701-02 (7th Cir. 2006) (holding that recorded statements by a confidential informant introduced only "to provide context for the defendant's admissions on the [same] recordings" are not offered for their truth); *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006) (same). We also have suggested that informants' statements

offered to explain why authorities targeted a particular defendant and to dispel an accusation of improper motive would not be offered to "prove the truth of the matter asserted," and thus would not constitute hearsay. *See United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) (noting that testimony regarding an informant's tip could be relevant to demonstrating why the Government targeted the defendant rather than the truth of the tip itself, but that no such argument had been advanced in that case). Furthermore, statements offered to rebut arguments the defense raises on cross-examination are not offered to prove the truth of the matter asserted, but to rehabilitate the witness and likewise are not hearsay. *See United States v. Whitaker*, 127 F.3d 595, 604 (7th Cir. 1997) (holding that testimony elicited in response to the defendant's suggestion on cross-examination that the witness had formed his conclusions incorrectly was not offered for its truth but to rehabilitate the witness).

The district court's limiting instructions confined the jury's consideration of Dubon's statements to Agent DePodesta to non-hearsay purposes. The testimony elicited from Agent DePodesta conformed to those limiting instructions. Agent DePodesta's testimony regarding Mr. James' prior dealings with Dubon were not excludable as hearsay.

The Confrontation Clause of the Sixth Amendment bars out-of-court testimonial statements unless the defendant had a prior opportunity to cross-examine the declarant and the declarant is unavailable to testify. *Van Sach*, 458 F.3d at 701. However, the Sixth Amendment does not bar out-of-court statements when the statement is not offered to prove the truth of the matter asserted; thus, the Sixth Amendment poses no bar to the admission of non-hearsay

statements. *See Crawford v. Washington*, 541 U.S. 36, 60 n.9 (2004); *Van Sach*, 458 F.3d at 701; *Tolliver*, 454 F.3d at 665. When out-of-court statements are not offered to prove the truth of the matter asserted, the Confrontation Clause is satisfied if the defendant had the opportunity to cross-examine the person repeating the out-of-court statement. *See Tennessee v. Street*, 471 U.S. 409, 414 (1985). Because Agent DePodesta's testimony as to Dubon's prior dealings with Mr. James was not hearsay and Mr. James had the opportunity to cross-examine Agent DePodesta, there is no violation of the Confrontation Clause.

Furthermore, the testimony elicited from Agent DePodesta was not inadmissible under Rule 404(b) of the Federal Rules of Evidence. Rule 404(b) prohibits evidence of prior crimes when such evidence is offered to suggest that the defendant acted in conformity with a particular character trait. Fed. R. Evid. 404(b). However, the testimony elicited here was limited to providing context for the investigation, not to prove the charged offenses. Absent any showing that the jury could not follow the court's cautionary instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction.

There was no error in allowing Agent DePodesta's testimony regarding Mr. James' prior dealings with Dubon.

### 2. Closing Argument

Mr. James also submits that statements made by counsel for the Government during closing arguments relating to prior drug transactions violated Rule 404(b) because they were intended to suggest to the jury that Mr. James had acted in conformity with earlier uncharged conduct.

Mr. James' attorneys raised no objection to these statements in the district court; therefore, we review them for plain error.

Mr. James first invites our attention to statements by the Government suggesting that he was an experienced drug dealer. Read in context, it is clear that the statements were offered to rebut the defense's theory that Mr. James was set up by Dubon because he was "an easy target." *See* R.113-4 at 592; *see also id.* at 621-22. Evidence of prior acts is admissible under Rule 404(b) to show proof of motive, knowledge or absence of mistake or accident. Fed. R. Evid. 404(b). Taken in context, these statements simply rebut Mr. James' assertion that he was the naive victim of Dubon's efforts to ingratiate himself with the federal prosecutor to avoid prosecution.[1] The Government contended that Mr. James' statements in taped telephone conversations and his demeanor when confronting Dubon were inconsistent with such naivete.

---

[1] In opening arguments, Mr. James' attorney stated "Allan Dubon, in order to get more money and curry more favor with the FBI, in February of 2000 began calling Donville James, my client. He called him incessantly because he believed that Donville would be an easy target to set up. He told Donville the story about the Mexican Mafia trying to kill or hurt him in order to get Donville to obtain counterfeit money to help him out." R.113-1 at 29. During closing arguments, Mr. James' attorney returned to this theme, stating: "I submit to you that my client was a target of Allan Dubon because he was stupid. He was an easy target because he was inexperienced." R.113-4 at 605. His attorney added, "Allan Dubon knew exactly who he could control. He knew exactly who could be a good target, would be a good patsy, who could be set up." *Id.*

Mr. James also points to a particular statement in which the Government references prior drug transactions with Dubon. Mr. James claims this statement was used impermissibly to prove conduct in conformity with the alleged prior bad acts. The Government stated:

> Ladies and gentlemen, Allan Dubon is a drug dealer who had a very comfortable drug dealing—series of very comfortable drug-dealing conversations with the defendant. And the only reason that could happen, ladies and gentlemen, was because the defendant and Allan Dubon had a drug relationship. You heard about heroin, you heard about marijuana and in this case, which is the case before you, cocaine, the trifecta of drugs, ladies and gentlemen, all three of them. And these guys talked about it. Allan Dubon is a drug dealer. Donville James is a drug dealer. And that is why you heard the two conversations you heard.

R.113-4 at 615. In context, this statement could be understood merely to continue the Government's argument that Mr. James was not the victim of a set up by Dubon. However, even if we give Mr. James the benefit of the doubt as to the characterization of this statement, we cannot say that any such error would affect Mr. James' substantial rights, and thereby constitute reversible error. Fed. R. Crim. P. 52(b).

Under plain error review, to demonstrate that an error has affected his substantial rights, the defendant bears the burden of "establishing that the outcome probably would have been different without the error." *United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006). That burden has not been met. Mr. James has not shown that the outcome would have been any different absent this statement. Any prejudice from this statement pales when evaluated in light of the overwhelming evidence of Mr.

James' guilt. Among the evidence introduced by the Government at trial was: a recorded conversation between Mr. James and Dubon discussing the transaction, testimony by federal agents who had witnessed the transaction or listened to it on the transmitter carried by Dubon, testimony by federal agents who found the gun in Mr. James' vehicle, testimony by federal agents who found the counterfeit money in the trunk of Mr. James' girlfriend's car, and Mr. James' signed statement admitting his guilt. In the face of this evidence, the outcome of Mr. James' trial in all probability would have been no different had the Government never made the statement in question. Therefore, any error flowing from the statement cannot be said to affect a substantial right; thus, it is an insufficient ground for reversal.

## B. Access to Evidence

Mr. James next submits that it was error for the district court to fail to require the Government to produce for inspection the recording device worn by Dubon. This issue has been waived. A defendant waives a right by intentionally relinquishing a known right. *United States v. White*, 443 F.3d 582, 591 (7th Cir. 2006). Such a waiver may be shown where a party asserts a right and later relinquishes that right. *See id.* Mr. James vigorously asserted his right to inspect the recording device the Government placed on Dubon. The Government, however, asserted that allowing Mr. James to inspect the device would compromise national security, and claimed, therefore, that the Government was entitled to deny Mr. James access to the device under a "national security privilege." Nevertheless, the Government did indicate that it would be

willing to stipulate to any facts that Mr. James wished to argue to the jury regarding the device. Therefore, rather than rule on the Government's claim of privilege, the district court asked Mr. James' trial counsel to draft a stipulation and to see if the Government would accept it. Eventually, the parties agreed to a stipulation drafted by Mr. James' trial counsel. The stipulation, as read to the jury, states:

> It is stipulated between the parties that the recording and transmitting device used by the Government on March 25[], 2002 in this case was not malfunctioning on that day. The device was capable of recording and transmitting and the device was capable of being turned on and off by the Government agents and informant involved in the case.
>
> [] [I]t is further stipulated that the Government has declined to produce the recording[-]transmitting device for viewing by this jury pursuant to a privilege which the Court has deemed valid.

R.113-3 at 513.[2] This stipulation constitutes the intentional

---

[2] Although the stipulation notes that the district court upheld the Government's claim of privilege, no such ruling actually was made. This matter was discussed during the jury instruction conference when the court considered a proposed jury instruction that also stated that the Government had declined to present the device for inspection based on a claim of privilege deemed valid by the court. A discussion followed in which the parties and the court recognized that the stipulation had been agreed to and submitted to the jury without the court having ruled on the Government's claim of privilege. The court declined

(continued...)

relinquishment of a known right; the issue therefore is waived.

### C. Waiver of Counsel

Mr. James next claims that the district court erroneously concluded that he had waived the right to counsel at his sentencing. We review the district court's finding of waiver de novo. *United States v. Kosmel*, 272 F.3d 501, 505 (7th Cir. 2001).

A criminal defendant has the right to waive his right to counsel and to proceed pro se. *United States v. Oakey*, 853 F.2d 551, 553 (7th Cir. 1988). Such a waiver, however, must be knowing and voluntary. *United States v. Sandles*, 23 F.3d 1121, 1126 (7th Cir. 1994). The trial court has an *affirmative* obligation to ensure that the defendant's waiver is voluntary and knowing. It therefore must conduct an inquiry into the defendant's ability to represent himself. Additionally, it must educate the defendant of the dangers of proceeding without counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975); *Sandles*, 23 F.3d at 1126.

However, our examination of the record reveals that Mr. James never actually waived his right to counsel during his sentencing. Following the verdict, Mr. James discharged his trial counsel and obtained new counsel.

---

[2]  (...continued)
to rule definitively on the privilege during the jury instruction conference, but agreed to instruct the jury that the Government had declined to turn over the device based on a claim of privilege deemed valid by the court because such instruction would "track the language of the stipulation." R.113-3 at 540.

There was, however, a period between the time when he fired his trial counsel and the time when he hired new counsel in which Mr. James was unrepresented. During that period, Mr. James filed a number of motions. Indeed, he continued to file motions on his own behalf even after he had obtained new counsel. Mr. James' new counsel reviewed these motions, informed the court that he could not adopt any of them, and proceeded to file separate motions on Mr. James' behalf. Mr. James, however, preferred the motions he had filed himself. In light of Mr. James' intelligence, which the court considered to be above average, and the work Mr. James had put into the motions he had filed on his own behalf, the court permitted Mr. James to argue those motions to supplement the motions filed on his behalf by his attorney. Although Mr. James requested to proceed pro se during his sentencing proceedings, he also requested that his counsel remain as "standby counsel" to answer legal questions. In effect, Mr. James wished to argue his own case with the assistance of counsel in preparing his case. In the end, the district court allowed Mr. James to proceed in this manner: The court permitted Mr. James to supplement the arguments of counsel with additional or different arguments without prejudice to the arguments presented by counsel. Thus, Mr. James was represented by counsel throughout the sentencing process. Although this arrangement resembled the sort of hybrid representation we previously have disapproved, there are significant differences. Our disapproval in earlier cases was based on the potential of such arrangements to confuse the jury, the fact that hybrid representation would allow the defendant to address the jury without being subject to cross-examination and the potential to offer defendants "two bites at the apple" during trial. *Kosmel*, 272 F.3d at 506. Here, those

concerns were absent. The arrangement was limited to Mr. James' sentencing hearing. Moreover, our prior disapproval of hybrid representation arose in the context of whether a criminal defendant has a *right* to hybrid representation, not whether the use of such an arrangement at sentencing necessarily constitutes reversible error.

Nor does this arrangement appear to have affected the outcome of Mr. James' sentencing. From the outset, the court stated that any potentially incriminating statements by Mr. James would be taken without prejudice to any legal arguments his lawyer wanted to make.

### D.  Sentencing

The district court sentenced Mr. James to 211 months' imprisonment. The court arrived at this sentence by first calculating the advisory guidelines range for the attempt to possess with intent to distribute cocaine offense. This process resulted in an advisory guidelines range of 151-188 months' imprisonment. After accounting for the factors set forth in 18 U.S.C. § 3553(a), as required by *United States v. Booker*, 543 U.S. 220 (2005), the district court determined that a sentence of 151 months' imprisonment for this offense was appropriate. To this sentence, the district court added a consecutive 60 month mandatory minimum sentence for the firearm offense, as required by 18 U.S.C. § 924(c)(1)(A)(i).

Mr. James submits that his sentence was not reasonable. He does not contest the district court's imposition of a 60 month sentence for use of a firearm in connection with a drug trafficking offense consecutive to the sentence for his other offenses. He challenges only that portion of his sentence that is attributable to his conviction for attempting to possess with intent to distribute cocaine. Mr. James

contends that the district court committed two errors in determining the quantity of cocaine that ought to serve as the basis of his offense level for purposes of calculating the advisory guidelines range. First, he contends that the district court erred by basing the amount of cocaine involved in his offense on quantities that he neither admitted to attempting to possess nor were determined by a jury beyond a reasonable doubt. He also submits that the district court erred by failing to apply the "sentencing entrapment" provisions of the advisory Guidelines in determining the amount of cocaine involved. *See* United States Sentencing Guidelines Manual § 2D1.1 cmt. n.12 & 14 (2002). Mr. James further contends that the district court erred by failing to consider properly the § 3553(a) factors when arriving at his sentence for attempted possession with intent to distribute cocaine.

We first turn to Mr. James' contention that the district court could consider only the amount of cocaine that he either admitted to attempting to possess or that a jury had found beyond a reasonable doubt that he had attempted to possess. Because the Guidelines are advisory only, the Sixth Amendment does not require that any facts that lead to an increase in the applicable guidelines range be admitted or found by a jury beyond a reasonable doubt, so long as those facts do not increase the statutory maximum sentence. *See United States v. White*, 472 F.3d 458, 464 (7th Cir. 2006). The statutory maximum sentence for attempt to possess with intent to distribute more than five kilograms of cocaine, the quantity charged in the indictment, is life imprisonment. *See* 21 U.S.C. §§ 841(b)(1)(A), 846. Because Mr. James' sentence for attempting to possess with intent to distribute cocaine was 151 months' imprisonment, any factual findings by the district court did not result in a sentence above the statutory maximum.

In the post-*Booker* era, we continue to review the district court's factual findings at sentencing, including findings related to drug quantities involved in an offense, for clear error. *United States v. McLee*, 436 F.3d 751, 755 (7th Cir. 2006). In arriving at its factual findings, the district court may rely on any evidence bearing sufficient indicia of reliability. *United States v. Sutton*, 406 F.3d 472, 474 (7th Cir. 2005). The trial record included recorded conversations between Mr. James and Dubon discussing the quantity of drugs involved and Mr. James' written statement in which he states that the transaction was to be for fifteen kilograms of cocaine. Based on this evidence, the district court determined that Mr. James did intend to purchase fifteen kilograms of cocaine. In light of this evidence, the district court's finding is not clearly erroneous.

The record also supports the district court's conclusion that Mr. James did not establish a sentencing entrapment defense. To establish this defense, the defendant must show that his predisposition not to commit the crime was "overborne by unrelenting government persistence." *United States v. Gutierrez-Herrera*, 293 F.3d 373, 377 (7th Cir. 2002). To overcome this defense, the Government only need establish the defendant's predisposition to commit the actual offense by demonstrating a "willingness to violate the law without extraordinary inducements." *United States v. Hale*, 448 F.3d 971, 989 (7th Cir. 2006). Here, the record showed only two phone calls between Mr. James and Dubon, the Government informant, leading to the transaction for which he was arrested and convicted. The district court found that, rather than display an unwillingness to commit the crime, Mr. James' statements during these calls evinced a complete willingness to proceed, even as the size of the proposed transac-

tion increased over the course of the phone calls. The district court did not err when it found Mr. James had not established the defense of sentencing entrapment.

The district court properly calculated the amount of cocaine involved in Mr. James' offense. Nonetheless, we review the defendant's sentence for reasonableness in light of the § 3553(a) factors. Although, under the law of this circuit, a sentence within the properly calculated advisory guidelines range will be considered presumptively reasonable on appeal, *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005), the district court's obligation to impose a "reasonable" sentence does not end there, *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006). The district court also must consider the § 3553(a) factors when arriving at its sentencing decision. *Id*. "A concise statement of the factors that caused the judge to arrive at a particular sentence, consistent with section 3553(a), will normally suffice." *Id.* The court need not make findings as to each of the § 3553(a) factors. *Id.*

At sentencing, the district court recognized that the Guidelines were advisory only. After calculating the applicable *advisory* guidelines range for Mr. James' attempt to possess with intent to distribute cocaine conviction the district court permitted both Mr. James and his attorney to speak in favor of a sentence below the advisory guidelines range. Both spoke, primarily focusing on Mr. James' history and personal characteristics. After Mr. James and his attorney spoke, the court discussed the factors which led to its decision to stay with the minimum sentence under the advisory Guidelines. The court first noted the positive personal traits of Mr. James and also noted that the advisory guidelines range for Mr. James' drug offense did not account for the counterfeiting conviction. Additionally, the court expressed concern that it had to apply the

Guidelines evenhandedly across cases. The court further noted the cumulative nature of the offense, involving drugs, guns and counterfeiting.

Although the court did not couch explicitly its discussion in terms of the § 3553(a) factors, the facts which led the court to stay within the advisory guidelines range are consistent with ensuring that the sentence reflect the seriousness of the offense and avoiding unwarranted sentencing disparities among defendants, both of which are § 3553(a) factors. *See* 18 U.S.C. § 3553(a)(2)(A), (a)(6). We note also that the district court's discretion with respect to the sentence it imposed on Mr. James for attempt to possess with intent to distribute cocaine was cabined by statute. Because the amount of cocaine involved in the attempted transaction was more than five kilograms, the statutory mandatory minimum sentence for that offense was 120 months' imprisonment. 18 U.S.C. § 841(b)(1)(A). *Booker* does not license district courts to employ § 3353 to disregard statutory mandatory minimum sentences. *See United States v. Duncan*, 479 F.3d 924, 930 (7th Cir. 2007).

The advisory guidelines range did not account fully for Mr. James' conduct in the offense, i.e., the use of counterfeit currency, or the cumulative nature of the offense. Further, Congress has determined through the statutory mandatory minimum sentence that the quantity of cocaine involved merited a substantial sentence. Therefore, we cannot say the district court's decision to impose a sentence at the bottom of the advisory guidelines range was unreasonable.[3]

---

[3] We would reach the same conclusion even if the sentence were not within the advisory guideline range.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—6-4-07